M. T. ANDERSON, et al., Plaintiffs and Appellants,

v.

WYOMING DEVELOPMENT COMPANY, A CORPORATION, et al., Defendants and Respondents.

(No. 2267; Dec. 13, 1944; 154 P. 2d 318)

For the plaintiffs and appellants there was a brief by Ellery & McClintock, of Cheyenne, Wyoming, and oral argument by Mr. C. R. Ellery.

For the defendants and respondents there were briefs by W. B. Jones, of Wheatland, Wyoming, O. O. Natwick, James A. Greenwood and Ray E. Lee, all of Cheyenne, Wyoming, and oral argument by Mr. Jones and Mr. Greenwood.

424

428

## OPINION

RINER, Justice.

This direct appeal proceeding questions the propriety of a judgment of the District Court of Platte County. The amended petition of the plaintiffs seeks declaratory and also certain supplementary coercive relief, and embodies nine alleged causes of action. It is somewhat voluminous as some 69 pages of the record submitted are required to set forth this pleading. The Court aforesaid sustained demurrers interposed

by the several defendants to each of these stated causes of action. Time was then allowed plaintiffs within which to file a second amended petition. This they chose not to do within the period fixed by the court orders just mentioned. Thereafter, upon motions made by the defendants to that effect, a judgment of dismissal of the entire action with prejudice was entered against the plaintiffs, to which adverse ruling of the Court they objected, and in due course saved their exceptions thereto. From this final judgment the review proceeding has been prosecuted.

The parties to this action are numerous and according to the specifications of error filed herein, some seventy persons were named therein as plaintiffs, and four hundred and thirty-five persons and corporations were listed as defendants who appear to be concerned in this appeal. The parties as listed in the amended petition, both as to plaintiffs and defendants, appear to vary somewhat from the figures last given. The Wyoming Development Company and the Wheatland Industrial Company, who may be regarded as the principal defendants, and will therefore most frequently be referred to subsequently herein, will usually be mentioned as the "Development Company," and the "Industrial Company," or as the "operating companies," when mentioned together, as those designations may be used for the sake of brevity.

### FIRST CAUSE OF ACTION

After describing the corporate defendants, nineteen in number, in paragraphs numbered one to nineteen, inclusive, the alleged first cause of action of plaintiffs' amended petition states in substance (and the entire amended pleading will be so given unless, as indicated by quotation marks, verbatim language is used) the following facts in its paragraphs numbered 20 to 22, inclusive.

That on or about May 15, 1883, the Development Company, which then owned or was acquiring the ownership of a large area of land in what is now known as Platte County, Wyoming, commenced the construction of a large irrigation system for the diversion of water from the Laramie River and Sybille Creek, to be used for the irrigation of said land. The diversion works to accomplish this use as to the waters of the Laramie River are located in Section 35, Township 23 North, Range 72 West of the 6th P. M., in Albany County, Wyoming. By means of these works and a tunnel the waters of this river are conveyed about two-thirds of a mile into what is known as Blue Grass Creek, at a point in Section 1, Township 22 North, Range 72 West of the 6th P. M., in said Albany County. The water is then conveyed down the creek last mentioned and Sybille Creek, in Section 23, Township 22 North, Range 70 West of the 6th P. M., in Platte County, Wyoming. Thence the water thus diverted passed down said Sybille Creek to the Development Company's diversion Canal No. 1, located in and on that creek in Section 13, Township 22 North, Range 70 West of the 6th P. M., in said Platte County. A second canal, known as Wyoming Development Company Canal No. 2, diverts water in Section 36, Township 24 North, Range 69 West of the 6th P. M., in Platte County, aforesaid, about thirteen miles below the diversion works of Canal No. 1, as measured along the Sybille Creek channel. After commencing the construction of this irrigation system the Development Company, from time to time, executed to various parties sundry deeds or contracts in the form attached to and made a part of the pleading and designated "Exhibit A."

This deed or contract form designates the Development Company as the "party of the first part," and blank spaces are left for the insertion of names of

grantees and the descriptions of the lands conveyed, after which appears the following:

"* * * together with the perpetual water right attaching to the aforesaid described land, which said water right shall consist of a quantity of water which shall be in the same ratio to the whole of said Wyoming Development Company's water appropriation (excepting appropriations hereinafter excepted), as the number of acres of the aforesaid described land shall bear to the number of acres in the whole of the lands which are capable of being irrigated by its irrigation system which was established prior to the first day of June, eighteen hundred and ninety-four. Said water right shall not exceed, however, the quantity authorized by the laws of the State of Wyoming appropriated for said above described land. Water stored in any reservoir or lake, or any canal or ditch constructed in connection with, or outlet for discharging water from any reservoir or lake owned, operated or controlled by said party of the first part, its successors or assigns, shall not be in any way be regarded as forming part of said irrigation system which was established prior to the first day of June, eighteen hundred and ninety-four, and shall be excepted in ascertaining the entire water appropriation of said party of the first part for the purposes of the ratio aforesaid. The supply of water herein provided for to be delivered at such convenient point on the line of said irrigation system as said party of the first part, its successors or assigns, may select and designate."

Covenants of seisin in fee, right to convey, warranty and against encumbrances, except as may be noted as to taxes and assessments, are set forth. The instrument then continues:

'It is expressly agreed that the said party.... of the second part, ....heirs, administrators, executors and assigns, shall at all times forever bear ........ or their pro rata share of any cost and expense which may be incurred by the party of the first part, its successors or assigns, for the purpose of maintaining in good repair and operating that portion of the general irirgation works from which the supply of water is to be

furnished to the aforesaid described land, which pro rata share of said cost and expense shall be a sum in the same proportion to the whole cost and expense of maintaining in good repair and operating said irrigation works as the area of the land hereinbefore described bears to the total area of all the land irrigated by means of said irrigation works, and the said share of such cost and expense shall, as soon as incurred, become a lien upon the said land so conveyed as aforesaid, and shall become due and payable to said party of the first part, its successors or assigns, upon demand, * * *."

Methods of enforcing the collection of the costs and expenses are thereafter set forth and it is then stated that:

"This covenant and agreement as to the maintenance of the said irrigation works and as to the payment of a proportionate share of the cost of such maintenance, as aforesaid, shall run with and against the land hereinbefore described, and shall be a perpetual charge thereon until paid."

The party of the first part reserves in said deed form:

"* * * for all time, without compensation to the party.... of the second part, ........heirs, administrators, executors or assigns, the right to lay out, construct, maintain, change and repair any and all enlargements or extensions of its main canals or ditches, and all laterals or subsidiary canals or ditches in connection with any of its main canals or ditches, and also pipe lines upon or through any portion of said described premises, and to use and have free access to the same; also, the right to lay out and establish and maintain upon and across said described premises such public roads as may be necessary or desirable for the convenient access to and ingress and egress upon and from the adjacent lands of said party of the first part, its successors, assigns or grantees."

Also attached to the pleading is "Exhibit B," which is an enumeration of those plaintiffs with descriptions

and acreage of their several land holdings, who own lands under deeds or contracts in the form of "Exhibit A."

Paragraph 23 of plaintiffs' amended petition states that on December 27, 1912, the District Court of Laramie County, in a cause before it entitled "In the Matter of the Adjudication of Priorities of the Right of the Use of the Waters of the Big Laramie River and Its Tributaries," entered a decree awarding to defendant, the Development Company, certain water rights in the use of the water of said Laramie River and said Sybille Creek. This decree, so far as it adjudicated to the Development Company such water rights, is then set out. After stating that the Court found that the Tunnel Ditch, the Tunnel, Canal No. 1 and Canal No. 2, of the Development Company, were component parts of a single irrigation system; that surveys for said ditches were commenced May 23, 1883, and the construction thereof and the application of water to the irrigation of the lands lying under them, was prosecuted with diligence; that the carrying capacity of said Tunnel and Tunnel Ditch exceeded 633 cubic feet per second, and the carrying capacity of said Canal No. 1 and Canal No. 2, exceeded in the aggregate 768 cubic feet per second; that Reservoir No. 1 of the Development Company was constructed in accordance with a permit issued by the State Engineer in March, 1897, with a capacity of 5360 feet, and the water of Sybille Creek stored therein was used for irrigation of lands capable of being irrigated thereby; and that said canals and reservoir were constructed for the purpose of irrigating lands thereunder aggregating 58,813 acres, of which 32,700 acres had been reduced to cultivation and were actually irrigated in the year 1909, the last irrigating season preceding the closing of taking of testimony in these causes, the decree then recites that:

"WHEREFORE, it is now ordered, adjudged and decreed that the several priorities of right to the use of the waters of the Laramie River and its tributaries and the amounts of appropriations of the several persons, including corporations, claiming water therefrom and the character and kind of use for which said appropriations have been made, are hereby determined and established as follows, to-wit:

| STREAM PRIORITY NUMBER | NAME OF DITCH | NAME OF APPROPRIATOR | POST OFFICE ADDRESS | DATE OF APPROPRIATION |
|---|---|---|---|---|
| 17 | Tunnel Ditch, Tunnel, Canal No. 1 and Canal No. 2 | Wyoming Development Company | Cheyenne, Wyoming | May 23, 1883 |

| USE TO WHICH WATER IS APPLIED | AMOUNT APPROPRIATED, CUBIC FEET PER SECOND | NO. OF ACRES IRRIGATED |
|---|---|---|
| Irrigation, Domestic and Municipal | 633.0 | 58,813" |

This statement is followed by a description of the land irrigated by legal subdivisions and the acreage thereof.

The decree thereupon continues as to Sybille Creek and Reservoir No. 1, thus:

"SYBILLE CREEK, TRIBUTARY TO LARAMIE RIVER:

| NAME OF DITCH | NAME OF APPROPRIATOR | POST OFFICE ADDRESS |
|---|---|---|
| Canal No. 1 Canal No. 2 | Wyoming Development Company | Cheyenne, Wyoming |

| DATE OF APPROPRIATION | USE TO WHICH WATER IS APPLIED |
|---|---|
| May 23, 1883 | Irrigation, Municipal and Domestic |

| AMOUNT APPROPRIATED, CU. FEET PER SECOND | NO. OF ACRES IRRIGATED |
|---|---|
| 135 | 58,813 |

DESCRIPTION OF LANDS IRRIGATED

Those lands hereinabove described in connection with Priority No.........from the Laramie River for the Tunnel, Tunnel Ditch, Canal No. 1 and Canal No. 2 of the Wyoming Development Company; this priority from Sybille Creek being supplemental to said priority from the Laramie River.

| STREAM PRIORITY NUMBER | NAME OF DITCH | NAME OF APPROPRIATOR | POST OFFICE ADDRESS | DATE OF APPROPRIATION |
|---|---|---|---|---|
| 19 | Reservoir No. 1 | Wyoming Development Company | Cheyenne, Wyoming | March, 1897 |

| USE TO WHICH WATER IS APPLIED | AMOUNT APPROPRIATED, CU. FEET PER SECOND | NO. ACRES IRRIGATED |
|---|---|---|
| Irrigation | 5,360 Acre Feet | |

DESCRIPTION OF LANDS IRRIGATED

A reservoir in Sections 31 and 32, Twp. 24 N., Rg. 68 W., and Sections 5 and 6, Twp. 23 N., Rg. 68 W., storing water for the supplemental irrigation of lands in Townships 24 and 25 N., Ranges 67 and 68 W. hereinabove described in connection with Priority No......... from the Laramie River of the Wyoming Development Company."

After forbidding waste of water the decree further adjudged that:

"Second: The users of the respective amounts of water hereby decreed for the canals of the Wyoming Development Company is restricted to the practicable utilization thereof, and the water is only to be allowed to flow into said canals in the ratio of not to exceed one cubic foot per second for each seventy acres of land; as the land under said canals shall be brought under practicable irrigation; and provided, that the said lands under said canals shall be brought under

such irrigation and the said proportionate amount of water used thereon with reasonable diligence. * * *"

It is also decreed that this judgment should in no manner affect the Development Company's Reservoir No. 2 or any other reservoir or ditch, the date for the completion whereof, according to the conditions of the respective permits, did not expire prior to May 25, 1900, the date fixed by the Board of Control, as the last day within which proofs of appropriation might be filed in the proceeding dealt with in said decree.

Paragraph 24 of the aforesaid cause of action alleges that this decree was entered in appeal proceedings from an order of the State Board of Control, made November 21, 1903, in a proceeding before it whose title is duly described.

Paragraph 25 states that since the entry of this decree the Development Company has made no attempt either to determine the dependable direct flow of the Laramie River available to it for appropriation and diversion through the Development Company's diversion works aforesaid on the Laramie River, or to allocate this direct flow water diverted by it to any specific and particular tract of said project for the irrigation thereof at the ratio of not to exceed one cubic foot per second for each 70 acres. Substantially the same allegations are made as to the direct flow water of Sybille Creek relative to the diversion works of the Development Company on said creek known as Canal No. 1 and Canal No. 2.

Paragraph 26 asserts that when water has been available from the Laramie River or Sybille Creek under direct flow rights the plaintiffs listed in "Exhibit B" aforesaid have irrigated their lands, and, by thus applying the water to a beneficial use, have perfected and completed the appropriation initiated by the Development Company, and that the plaintiffs are now

the owners of perfected rights to take from the Laramie River and Sybille Creek with priority of May 23, 1883, a quantity of water not to exceed one cubic foot per second for each 70 acres owned and irrigated by them; that plaintiffs' and defendants' rights are uncertain because the Development Company has not determined the dependable supply of water from these sources of supply of said rights, has not allocated same to specific tracts of land and has not instituted proceedings for the final determination of the rights of the aforesaid decree. The defendant operating companies have, at all times, controlled the distribution of water under said rights as they saw fit, and plaintiffs have been without recourse to the state officials who administer water. Plaintiffs and many of defendants are prevented thereby from receiving the full quantity of water to which they are legally entitled under Wyoming law and their deeds from the Development Company and are unable to develop their lands properly.

The defendants and each of them claim to be the owners, so asserts paragraph 27, of the right to take the direct flow of the Laramie River and Sybille Creek for the irrigation of lands owned by them under the same rights under which plaintiffs claim and plaintiffs are without information as to the nature of said claims, or the exact description of the lands for which these rights are claimed.

The controversies, which plaintiffs assert arise upon the foregoing alleged facts, are stated in substance as follows:

28.   Plaintiffs claim that under the 1912 decree the Wyoming Development Company had only an inchoate, unperfected, water right from the Laramie River and Sybille Creek, which right could become choate, vested, and perfected only by application of water there-

from to specific tracts within the area generally described in said decree.

Wyoming Development Company claims that it has a vested right perfected to take 633 cubic feet per second from the Laramie River, and 135 cubic feet per second from Sybille Creek for use on all or such part of land described in said decree as it saw fit.

29. Plaintiffs claim it was the duty of the Wyoming Development Company under said decree, within reasonable time, to determine the amount of lands that could be irrigated by means of dependable supply of water from the Laramie River and Sybille Creek, and to apply the water available, one cubic foot per seventy acres, to specific tracts within the area described in said decree.

Wyoming Development Company claims it to be under no duty to determine the dependable supply of water from these sources or to apply the same to specific tracts, and that it could use the water available from all sources on all or such part of the lands described in said decree in such manner as it saw fit.

30. Plaintiffs claim that under said decree it was the duty of the Wyoming Development Company, within a reasonable time after entry of said decree, and after the dependable available supply had been applied at the rate of one cubic foot per second per seventy acres, to bring a proceeding in the District Court of Platte County to secure a decree declaring the dependable supply of water available had been applied to specific tracts, and that the Development Company or its successors in interest to be the owner of a perfected and vested right to take a specific quantity of water from each source of supply as an appurtenance of such specifically described area.

Wyoming Development Company claims that no further proceedings are necessary; that it, at all times after said decree, owned a perfected and vested right to take all water available and to use same on all or such part of the lands described in said decree in such manner as it saw fit.

31. Plaintiffs claim that when the Wyoming Development Company executed deeds that company conveyed to its grantees, as an appurtenance of the land and water right so conveyed, an equivalent interest in all diversion irrigation works and canals and ditches for conveyance of water to the place of use, and each of said grantees became an owner of a partial interest in said works to the same extent as the water right conveyed.

Wyoming Development Company claims that no title, right, nor interest passed by said deeds in said irrigation works and it is the sole owner thereof.

32. Plaintiffs claim that the dependable supply available from all sources having been now conveyed, to individual purchasers all of the Development Company's title in said works has been divested and purchasers now own the same in fee.

Wyoming Development Company claims that it now owns these works, canals, etc.

### SECOND CAUSE OF ACTION

Paragraphs numbered 1 to 26, inclusive, of the first cause of action are incorporated by reference in the second.

Plaintiffs charge in paragraph 27, on information and belief, that the Development Company has already delivered deeds in the form of "Exhibit A" covering more than 35,000 acres of the land described in the aforesaid decree, whose exact description plaintiffs do not know. Paragraph 28 avers that the Laramie River and Sybille Creek, at times carry a quantity of water considerably in excess of that required to satisfy the above mentioned rights from said streams but that for the most part, and during the crucial part of the irrigating season, the direct flow of said streams is, every year, insufficient to satisfy "only a small portion of the demands already created by the sale of lands under contracts in the form of 'Exhibit

A'," aforesaid; and that the Development Company at such times divides the quantity of water available among all the landowners demanding same. In consequence, for more than ten years, the owners of lands holding such deeds to direct flow rights have insufficient water to properly irrigate their lands.

Paragraph 29 avers that despite the shortage of water and inadequate supply during the past ten years, in these two streams, the Development Company continues to attempt to sell, and in some instances has sold, additional lands described in said decree by deed in the form of "Exhibit A"; that as more of said deeds are executed each owner is cut down in the amount allowed him, and "each owner receives a proportionate part of the available supply without reference to his rights under said deed"; and that the Development Company, unless restrained by court order, will continue to follow this procedure thus described to the injury of each landowner. Upon these allegations the controversies asserted to exist are:

30. Plaintiffs claim under Exhibit A that each grantee received a partial interest in said water rights to an extent of one cubic foot per seventy acres bought by him and when the total of the partial water rights sold represented a quantity of water equal to the dependable supply from the water sources described in the decree said company had been divested of all property in said water rights and could convey no further interests.

Wyoming Development Company claims that it can continue to sell lands with a proportionate water right until the entire area of land described in the decree has been exhausted.

31. Plaintiffs claim that if the Development Company has given deeds to land described in said decree together with water rights therefor in excess of the dependable water supply at one cubic foot of water per seventy acres sold, all conveyances purporting to

convey an interest in said water rights after the dependable supply had been exhausted are void and convey no interest in said water rights and in the sources of supply.

Wyoming Development Company claims it was not limited to dependable supply and that it can continue to execute conveyances of partial interests until all the lands described in said decree have been transferred.

32. Plaintiffs claim that if the dependable supply of water available from the two streams (Laramie River and Sybille Creek) has been exhausted any deed by the Development Company after that time purporting to convey any interest in the water rights is void and grantee took nothing.

Wyoming Development Company claims it to be immaterial whether or not the dependable supply of water has been exhausted and that all purchasers now having or hereafter receiving conveyances are on an equal basis and are entitled to demand and receive only such proportion of the water available from the supply sources as their irrigable lands bear to the entire acreage described in the decree.

### THIRD CAUSE OF ACTION

Paragraphs numbered 1 to 24, inclusive, of the first cause of action are incorporated by reference in the third.

It is asserted in paragraphs numbered 25 to 30, inclusive, that being desirous of increasing the water supply for use on the aforesaid lands through the irrigation system already described, and also on some additional lands in the vicinity not originally included, the Development Company, about January 29, 1898, obtained from the State Engineer, a permit to store the waters of the Laramie River for use in the irrigation of described lands totaling some 63,560 acres, said permit being numbered 1724. Under this permit Wyoming Development Company Reservoir No. 2 was

thereafter constructed located on certain lands described by legal subdivisions. The lands to be irrigated by the water from this reservoir are also duly described by legal subdivisions. It is then stated that the defendant, Industrial Company, a subsidiary company owned entirely by the Development Company, "appears" to have taken over the ownership and control of Reservoir No. 2, and all rights of the Development Company under Permit 1724, aforesaid, although no such transfer appears of record and its nature is unknown to plaintiffs. Since Reservoir No. 2 was constructed in order to supply additional water to supplement direct flow rights held by each purchaser under "Exhibit A" deed or contract form aforesaid, the Development Company (?) has, from time to time, delivered to each such purchaser a deed or contract in the form of "Exhibit C," made a part of the pleading by reference. The Development Company (?) has, at times, delivered deeds in this form to the owners of lands described in said Permit No. 1724, but not in said decree.

This deed form "Exhibit C" names the Industrial Company as the party of the first part, i. e., the grantor, and blank space is provided for the insertion of the name or names of the parties of the second part. The property or interest conveyed by this instrument is described thus:

"* * * a perpetual water right in, to, and of the waters stored and impounded and to be stored and impounded in that certain Reservoir situated in Albany County in the State of Wyoming, and known as and called Wyoming Development Company's Reservoir No. Two, * * *."

This is followed by a rather detailed description of Reservoir No. 2. It is then stated that:

"The quantity of water hereby conveyed, and to be supplied from said Reservoir, shall be such quantity

as with and in addition to the quantity which the said party of the second part has acquired for the irrigation of said land from the Wyoming Development Company, a corporation organized under the laws of the State of Wyoming, as will furnish a supply, (not exceeding from both sources the amount of water authorized by the law of the State of Wyoming appropriated for the use and benefit of said land) for the proper and reasonable irrigation of said land throughout each recurring irrigation season; provided, however, that at no time shall said party of the second part, ........heirs or assigns be entitled by reason of this instrument to demand or receive of said waters stored and impounded or to be stored or impounded in said Reservoir, any quantity of water in excess of that quantity which bears the same ratio to the entire quantity of water stored and impounded in said Reservoir as does the entire area of said hereinbefore described land bear to the entire area of all the land capable of being irrigated therefrom, through the irrigation system of the Wyoming Development Company as the same is now established or as it may hereafter be extended."

Covenants are thereupon inserted similar to those mentioned above as appearing in "Exhibit A." Agreement clauses are set forth that the party of the second part:

"* * * will at all itmes forever bear ........ or their pro rata share of the cost of any work or services and any and all expense which may be incurred by said party of the first part, its successors or assigns, in maintaining in good repair and in operating said Reservoir, and that they will pay the same to said party of the first part, its successors or assigns, on demand, and that the amount of such share of such cost and expense shall as soon as incurred be and become a lien and charge upon said hereinbefore described land; * * *."

This "pro rata" share of the "cost and expense" is defined in the deed form thus:

"It is further agreed between the parties hereto, that the said mentioned pro rata share of said cost

and expense shall be a sum in the same proportion to the whole cost and expense of maintaining in good repair and operating said Reservoir, as the area of land hereinbefore described bears to the total area of all the land irrigated therefrom, through the irrigation system of the Wyoming Development Company as the same is now established or as it may hereafter be extended."

Methods of enforcing the collection of any defaulted "cost and expense" payments are agreed upon and described.

Paragraph 28 states that all except some eight plaintiffs hold deeds in the form of "Exhibit C" aforesaid, in addition to the direct flow rights described in said decree. These eight persons have no direct flow rights but do possess deeds in the form of said "Exhibit C."

It is alleged in paragraph 29, that, as above noted, the matter of Reservoir No. 2 aforesaid was not adjudicated in said decree, and that since its entry, neither the Development Company nor its assignee, the Industrial Company, has made any attempt to determine the dependable flow of the Laramie River available for appropriation and storage in said Reservoir No. 2, and no attempt has been made by these companies to allocate the water of said river stored in said Reservoir No. 2, to any particular tract of said project lands for the irrigation thereof at the ratio of not to exceed one cubic foot per second for each seventy acres of land irrigated.

The controversies asserted to exist upon the facts presented by the allegations of this cause of action are briefly reviewed in the following paragraphs:

31. Plaintiffs claim that under the terms of the permit for Wyoming Development Company Reservoir No. 2, the Development Company and the Industrial Company were given a license to divert and store the

water of the Laramie River for the irrigation of such portion of the lands described in said permit as there was a sufficient supply of water for at one cubic foot of water per second for each seventy acres of land, which license would ripen into a vested and perfected water right only by the application of the stored water in said reservoir to specific tracts within the area described in the permit.

Wyoming Development Company and Wheatland Industrial Company claim they were not limited to the use of the water on the lands described in said permit or to the reclamation of lands at the rate stated and that they can use the water on such lands wherever located and in whatever quantity as they saw fit.

32. Plaintiffs claim that under said permit it was the duty of the Development Company or its assignee, the Wheatland Industrial Company, prior to December 31, 1929, the date set therein for the expiration of the time within which to make beneficial use of the water diverted under said permit, to determine the amount of lands that could be irrigated by means of the dependable supply of water available for storage and use and to apply the same to beneficial use at the rate of one cubic foot a second per each seventy acres irrigated on specific tracts within said area generally described in said permit.

Wyoming Development Company and Wheatland Industrial Company claim that they were under no duty to determine such dependable supply or to apply the same to specific tracts and that they could use the water available for said reservoir upon such lands and in such manner as they saw fit.

33. Plaintiffs claim that under said permit it was the duty of said companies, within a reasonable time after the expiration of the permit, to bring action before either the State Board of Control or in the District Court of Platte County, to secure an order declaring that the dependable supply of water from the Laramie River for storage in said Reservoir No. 2 had been applied to beneficial use on specific tracts according to the area irrigated in each legal subdivision and declaring said companies or their successors

in interest to be the owners of a perfected and vested right to take water from the Larmie River for storage in said Reservoir and thence for the irrigation of such specifically described lands as an appurtenance thereof.

Wyoming Development Company and Wheatland Industrial Company claim that after construction of said reservoir the Industrial Company was the owner of a vested and perfected right to divert and store the waters of the Laramie River and to use the same on such lands and in such manner as it saw fit.

34. Plaintiffs claim that the right to the entire dependable supply available for diversion and storage in said Reservoir No. 2 having been conveyed to individual purchasers owning lands in said original project all the title of the Development Company and the Wheatland Industrial Company in said Reservoir, and the right to store water therein, has been divested, and said purchasers now own the said reservoir.

Wyoming Development Company and Wheatland Industrial Company claim that they have never parted with title to said reservoir and now still own it.

FOURTH CAUSE OF ACTION

Paragraphs 1 to 30, inclusive, of their third cause of action, plaintiffs incorporate in the fourth cause of action by reference.

Plaintiffs state in Paragraphs 31 and 32, upon information and belief, that the Development Company has already delivered to purchasers thereof deeds in the form of "Exhibit C" aforesaid, covering lands described in said deeds, totaling more than 42,500 acres, the exact description of which lands is unknown to plaintiffs; that the available dependable flow of said Laramie River and Sybille Creek, making full use of all reservoirs on the project aforesaid, is less than 110,000 acre feet of water a year; that The Swan Company claims a prior right to take approximately 10,000 acre feet of this flow, under a contract

with the defendant, Development Company; that if said right is sustained, less than 100,000 acre feet of water is available for the irrigation of project lands, making no allowance for delivery losses through seepage and evaporation; that for ten years the quantity of water available from all sources of supply for said project has been far below the quantity necessary for the irrigation of all the lands having rights to said water.

Paragraph 33 charges that despite this shortage of water the Industrial Company continues to attempt to sell, and, in some instances, during the last ten years, has sold rights to the use of water in said Reservoir No. 2, under the same form of deed as "Exhibit C," and will, unless restrained by court order, continue to do this, thus increasing the demands upon the available quantity of water to the damage of those who now hold said deeds. Paragraph 34 says that about April 19, 1940, the two companies aforesaid filed with the State Engineer an application for a secondary permit, describing said Reservoir No. 2, as the source of supply, and describing approximately 63,000 acres of land which said companies proposed to irrigate by means of water stored therein; these lands thus proposed to be irrigated were particularly described in "Exhibit E," which is a copy of a map attached to the application aforesaid, said exhibit being recited as made a part of the pleading by reference; that said companies will furnish water for said lands from said Reservoir No. 2, unless restrained by court order. However, this map states that it is a:

"Map of
Enlargement application of Wyoming Development
Companies No. 1 and No. 2 Canals & Tunnel
Applicant
Wheatland Industrial Company
Wheatland, Wyoming
Scale 2" - 1 mile

Note:

This secondary Reservoir filing is made for the purpose of clarifying the records of the State Engineer's Office; for the purpose of elimination of duplication of acreage and for the purpose of limiting the maximum acreage under Secondary Reservoir Permits, being 63,560 acres set forth in primary permit No. 1724."

Underneath this statement and note is the further statement "Approved October 4, 1941, L. C. Bishop, State Engineer"; above the name L. C. Bishop, appears a writing purporting to be the written signature of that official.

The controversies arising upon the facts thus presented in this cause of action are stated to be:

35. Plaintiffs claim that under "Exhibit C" each grantee owning lands described in said Reservoir permit received a partial interest in said Reservoir No. 2, and the right to store water therein to the extent of one cubic foot per seventy acres of irrigable land owned by him, and that when the total of such partial rights so deeded reached an amount equal to the dependable supply available for storage in said reservoir said Industrial Company had become divested of all property therein and in the right to store water therein and could not convey any further interests therein.

Wyoming Development Company and Wheatland Industrial Company claim that under said deeds each purchaser received only the right to receive water from the reservoir in the proportion that the land owned by him bore to the entire area of land in said project and also described in said permits (two), and said Industrial Company could continue to sell water from said reservoir for use on all lands described in said decree and permits (two) until reservoir rights for the entire area had been conveyed.

36. Plaintiffs claim that if the dependable supply of water available from the Laramie River for storage in said reservoir has been exhausted, any conveyance executed by said Industrial Company purporting to

convey any interest in said reservoir or its water was and is void and grantee took nothing.

Wyoming Development Company and Wheatland Industrial Company claim that it is immaterial whether the dependable supply has been exhausted or not and that all purchasers now having or hereafter receiving deeds from either of said companies are on an equal basis and are entitled to demand and receive only such proportion of the water available from said reservoir as their irrigable acreage bears to the entire acreage descibed in the decree and permits (two).

37. Plaintiffs claim that under the terms of the permit said Development Company or Wheatland Industrial Company could create no right to take water from said reservoir for the benefit of any lands not described in said permit and that any conveyance of said companies purporting to convey such right for lands not included in said reservoir permit was and is void and gave grantee no interest in said reservoir or in the right to store water therein and to receive water from it.

Wyoming Development Company and Wheatland Industrial Company and defendants Alois Baader to Wyoming Farm Loan Board, as listed in the title of this cause, (25 in number including Wyoming Farm Loan Board), claim that such conveyances are valid and entitle such grantees to receive a proportionate share of the water stored in said reservoir with plaintiffs and defendants owning lands in said original project.

38. Plaintiffs claim that it is necessary for the district court to determine the dependable supply of water available for storage in Reservoir No. 2 and for use on said project. After that is done to exclude from said project all lands title to which is now in the Wyoming Development Company, all lands outside the area described in Permit No. 1724 (Reservoir No. 2) but the conveyance of water for which was executed subsequent to the exhaustion of the dependable supply of water, or subsequent to December 31, 1929.

Wyoming Development Company and Wheatland Industrial Company claim that there is no need to deter-

mine the dependable supply of water and none of the land mentioned can be excluded from any interest in said Reservoir No. 2.

### FIFTH CAUSE OF ACTION

In this cause of action paragraphs 1 to 30, inclusive, of plaintiffs' third cause of action are again incorporated by reference.

Paragraphs 31 and 32 following state that the defendant, Industrial Company, is a Carey Act Construction Company as relates to what is known as the Bordeaux Carey Act Project; that about October 13, 1904, "Permit No. 1276 Enl." was issued by the State Engineer of Wyoming to said company in which permit lands totaling 7,543.51 acres are described; about April 18, 1907, "Permit No. 1681 Enl." was issued to said Industrial Company by said state official, in which permit lands totaling 2,381 acres are described. Both permits aforesaid specify the source of supply of water for irrigating these lands as "Wyoming Development Company's Reservoir No. 2," and the works are described as enlargement and extension of Wyoming Development Company's Canal No. 1; that said lands are no part of the 58,813 acres described in said decree, or the 63,560 acres described in Permit No. 1724 (Reservoir No. 2) but all the lands in Permits 1276 and 1681, aforesaid, are proposed to be reclaimed under the provisions of the Carey Act; of these lands the Industrial Company has issued contracts for the sale of water or deed thereof for approximately 2,500 acres of irrigable acreage in said project. The part of said deeds "purporting to convey a water right" recites, after setting out the name of the Industrial Company as the party of the first part and providing a blank space for the insertion of the name of the grantees and the amount of the consideration, that the instrument conveys:

"* * * a perpetual right to the use of so much water to be delivered through the 'Wheatland Industrial Company's Canal No. 1,' not exceeding one-half cubic foot per second of time for each thirty-five acres thereof, as may be necessary for the proper irrigation of the following described land situate, lying and being in the County of Platte, State of Wyoming, and none other, to-wit:

.................................acres lying in.................................

Together with the right to use such water for domestic purposes upon the said described lands and together with that proportionate undivided interest in and to the said No. 1 canal and the water permits and appropriation therefor which bears the same ratio to the entire interest of the party of the first part in and to the said No. 1 Canal and water permits and appropriations as the number of acres of land irrigable from the said No. 1 Canal lying within the subdivisions hereinbefore described bears to the total number of acres of land irrigable from the said No. 1 Canal and for the irrigation whereof through the said No. 1 Canal permits have been or shall have been issued by the State Engineer of Wyoming prior to the time when the said party of the first part shall transfer to the said part.... of the second part and other water-right purchasers the management and control of the said irrigation system, as hereinafter provided."

The manner of this transfer referred to in the last sentence above quoted is not pleaded. The Industrial Company has, so paragraph 32 states, already executed deeds "purporting to convey" to the entrymen or owners some 2,500 acres of land in said Carey Act Project, an interest in said Reservoir No. 2 equal in right and priority with that of purchasers of lands in the original project and unless enjoined by court order, will continue to deliver deeds "purporting to convey interest in said Reservoir No. 2 to the extent of the entire acreage in said Bordeaux Project."

The controversy arising on these allegations is thus stated:

33.   Plaintiffs claim that under the terms of Permit No. 1724 (Reservoir No. 2) said Industrial Company could create no right to take water from said Reservoir No. 2 for the benefit of any lands not described and included in said permit, and that any conveyance for said company purporting to convey such right in said reservoir as above described was void and gave grantee no interest in said reservoir.

Wyoming Development Company and Wheatland Industrial Company claim that such conveyances were valid and entitle such grantees to a proportionate share of the water stored in said reservoir on a parity with plaintiffs and defendants owning lands in the original project.

### SIXTH CAUSE OF ACTION

In this cause of action also paragraphs 1 to 30, inclusive, of plaintiffs' third cause of action are incorporated by reference.

Paragraph 31 following states that said Reservoir No. 2 is located on land owned by The Swan Company, which was leased to the Development Company by written lease portions of which are then set forth. After describing the parties to this instrument, viz., The Swan Land and Cattle Company, Ltd., a corporation existing under the laws of the United Kingdom of Great Britain and Ireland, and doing business in Wyoming, as lessor, and the Development Company as lessee, the lease term as:

"* * * from the date hereof and thenceforth throughout such period of time as the lands hereinafter described may be used and occupied as the site of a Reservoir for the retention and storage of water for supplying the irrigation system of said party of the second part with water, * * *,"
and the lands leased totaling about 6,000 acres located in Albany County, Wyoming, the consideration is stated to be:

"* * * the right to the use throughout the irrigation season of each and every year hereafter, during the

existence of said grant and demise, as hereinbefore stated, of such quantity of water as may be carried and conveyed through and by means of the irrigation ditches of said party of the first part, and hereinafter named and described, for the irrigation of lands owned by said party of the first part, its successors or assigns lying under said ditches and capable of being irrigated therefrom.

The said water to be taken into said ditches from that portion of the irrigation system of the said party of the second part which is known as and commonly called the Sybille Creek and the water right hereby granted and conveyed and being a portion of the water and water right heretofore lawfully acquired by appropriation under the laws of the State of Wyoming by said party of the second part."

The ditches of the lessor are then named and their dimensions and water carrying capacity described, said ditches being two in number and designated as the "Mule Shoe Ditch" and the "Two Bar Ditch." The quantity of water to be furnished by the lessee to the said lessor is recited to be in accord with that capacity only. As an additional right and in further consideration for the lease, lessee grants to the lessor:

" '* * * the right to the use throughout the irrigation season of each year during the existence of said grant and demise, of such quantity of water as may be necessary for the proper irrigation of three hundred acres of land, the same to be furnished by said party of the second part and received by said party of the first part at such point on Sybille Creek as said party of the first part may select'."

Paragraph 32 alleges that the Swan Company is not the owner of any of the lands included in Permit No. 1724 (Reservoir No. 2) and specifically described in paragraph 25 of this cause of action. While the date of this instrument is not set out yet in the brief of the defendant, The Swan Company, it is stated to be March 1, 1900. This fact does not seem to be disputed

and, indeed, is confirmed by statements in the pleaded claims of the parties which are:

33. Swan Company claims ownership of right to take water from Reservoir No. 2 at all times to full capacity of its two ditches, Mule Shoe and Two Bar, plus additional water sufficient to irrigate 300 acres of land.

Plaintiffs say this claim is without merit and that Swan Company has no interest in Reservoir No. 2 or in the water stored therein.

34. Plaintiffs claim that under Permit No. 1724 no rights in said reservoir, its stored water, or right to take water therefrom could be secured from the State of Wyoming for the benefit of any lands not described in said permit and so any attempt of the Development Company to create any interest in said reservoir for the benefit of lands not described in said permit was void and The Swan Company has no interest in said reservoir, the right to store water in it or take water therefrom.

Swan Company claims the permit did not operate to limit the land to be benefited by said reservoir and that it is the owner of a valid interest therein and in the water therein.

35. Plaintiffs claim that the Development Company could have condemned the land belonging to the Swan Company and now occupied by Reservoir No. 2 and that the individual owners of rights in said reservoir, having succeeded to the interest of the Development Company, are now entitled to continue in occupation of said reservoir and the land covered thereby, being liable only for the reasonable value of the land at the time said reservoir was constructed.

Swan Company claims: None set out in pleading.

36. Plaintiffs claim that The Swan Company, having had the use of water stored in said reservoir for over forty years, is liable to plaintiffs for the reasonable value thereof and said owners on said original project are entitled to set off such amounts against the claim of The Swan Company.

Swan Company claims it owns a valid interest in the reservoir and is not liable for water taken therefrom.

37. Plaintiffs claim that if The Swan Company does have a valid interest in said reservoir it is entitled to receive from it, through its two ditches, only such quantity of water which at the rate of one cubic foot per each seventy acres is sufficient for the irrigation of lands thereunder.

Swan Company claims to be entitled to take full capacity of ditches without reference to statutory duty of water.

38. Plaintiffs claim that if said Swan Company has a valid interest in said reservoir said Company is entitled to demand only such additional quantity of water at statutory rate as is sufficient for the irrigation of such amount of land, not to exceed 300 acres, as should be designated by The Swan Company within a reasonable time after construction of reservoir.

Swan Company claims to be entitled to demand such additional quantity as it may now or hereafter need for the irrigation of such 300 acres as it has heretofore and may hereafter designate.

39. Plaintiffs claim that if The Swan Company has a valid interest in said reservoir it was the duty of said company prior to December 31, 1929, to determine the amount of land lying under the two ditches and such other ditch as should be maintained for the benefit of the 300 acres and to apply the water at the statutory rate on specific parcels under said ditches.

Swan company claims to be entitled to demand the full quantity of water that its ditches will carry and apply such water where it sees fit.

40. Plaintiffs claim that if the Court declares the Swan Company has a valid interest in said Reservoir No. 2 it was its duty, within a reasonable time after the completion of the reservoir, to join in any proceedings before the State Board of Control or the District Court of Platte County, relating to the right to divert, store and use water from said reservoir

and secure a decree that a specific quantity of water from said reservoir had been applied to beneficial use on specific tracts of land and declaring the company to be the owner of perfected and vested right to take a specific quantity of water from said reservoir.

Swan Company claims that it was unnecessary to bring any further proceedings for adjudication of its rights and that it now owns vested and perfected rights to take the full quantity of water that can be carried through its ditches which quantity can be used whenever and wherever said company sees fit.

41. Plaintiffs claim that if The Swan Company has a valid interest in said reservoir nevertheless it was not to receive the water free and clear of maintenance charges and is liable to the Development Company or Industrial Company, as agents and trustees for the parties to this suit who have heretofore paid the cost of maintenance and operation of said Reservoir No. 2 and the irrigation works in connection therewith.

Swan Company claims to be entitled to receive the water free and clear of any charge or assessment for maintenance of operation costs.

### SEVENTH CAUSE OF ACTION

Here again, paragraphs 1 to 30, inclusive, of plaintiffs' third cause of action are incorporated by reference.

Paragraphs 31 to 38, inclusive, state that the Development Company has brought "some small part of the lands described in said decree and Permit No. 1724" (Reservoir No. 2) under irrigation and cultivation by its own efforts but "the greatest part of the lands in said project" have been brought under cultivation by plaintiffs "and other purchasers of lands from the company or their predecessors in interest." These purchasers have never controlled the administration of the company or the distribution of water through said irrigation system but, at all times,

have received water as the company delivered it to them. The operating companies have never sought to differentiate between direct flow and stored water or between Laramie River and Sybille Creek rights but for many years have distributed water thus: a portion of the combined stored and direct flow water of the Laramie River and the direct flow water of Sybille Creek conveyed to the project lands above mentioned and used to irrigate same returns by seepage to the Sybille Creek channel and becomes a part of the waters of said stream between Canal No. 1 and Canal No. 2; that since about the year 1914, the water of Sybille Creek has been mingled and combined with the stored water of Reservoir No. 1 and used for the irrigation of certain of the project lands, the description and acreage of which the plaintiffs do not know.

Since the entry of said decree, the operating companies have not attempted to determine the dependable flow of the Larmie River through its diversion works on said river, the dependable direct flow water of Sybille Creek for appropriation through its Canal No. 1 or Canal No. 2, the dependable flow of said Sybille Creek for storage in said Reservoir No. 1 or Reservoir No. 2, or to allocate these waters to any specific and particular tract of said project lands for the irrigation thereof at the rate of not to exceed one cubic foot per second of time for each seventy acres irrigated. As a direct result of the failure of said companies to define the rights of any user in any specific water right or source of supply, plaintiffs and all other users are without exact knowledge as to their rights, the quantity of water which they have received, or the source of supply in which they are entitled to share. Plaintiffs have, however, at all times "made full beneficial use" of the combined and mingled water supply as aforesaid when it has been made available.

On information and belief it is stated that the total dependable supply of water available from all sources of supply for use on said project does not exceed 110,000 acre feet of water a year; that the combined source of supply is not sufficient to irrigate the amount of lands now irrigated by purchasers from the operating companies upon the original project, these lands totaling approximately 40,000 acres, these lands other than those owned by the plaintiffs being unknown to the latter; that some twenty-five named defendants, including the Wheatland Industrial Company, claim water for irrigation of some 2,500 acres of land whose description is unknown to plaintiffs; that the defendant, the Swan Company, claims water for some 2,300 acres of land, making a total of 45,000 acres of land for which water is presently being demanded from said combined source of supply excluding from consideration land owned by said operating companies and presently receiving water.

It is also averred that despite long continued shortage of water and the fact that the dependable supply of water available for said project is less than 110,000 acre feet of water per year, the Development Company has continued to sell additional lands on said project together with a "purported water right" and the Industrial Company has continued to sell "additional interests in said Reservoir No. 2" with the result that, while the supply of water has been diminishing, the demands upon that supply have been increasing; that the said purchasers are now and for many years have been unable to secure the quantity of water to which they are and were entitled under their warranty deeds, this quantity being asserted to be an adequate supply which is "essential to the adequate cultivation of their lands"; that despite the continued shortage of water caused by excessive sales thereof by the operating companies and while plain-

tiffs and other purchasers from the companies are not receiving the quantity of water to which they are entitled the operating companies claim the right to, and are taking water for, the irrigation of lands owned by them, thus further injuring plaintiffs "and others"; that if the operating companies are not enjoined from creating further demands for water from the sources of supply, the companies will continue to execute deeds to said water supply until the owners of at least 64,000 acres of land are demanding water and plaintiffs' and "other purchasers'" lands will be "virtually worthless."

Upon these alleged facts the controversy arises, it is said, that:

39. Plaintiffs claim that it is necessary for the District Court to ascertain the combined dependable supply of water available for use on said project from all sources and then to exclude all acreage which is owned by the Wyoming Development Company and the Wheatland Industrial Company, all lands outside the area described in the decree or Permit 1724, and all lands described in said decree or permit, the conveyance of water for which was executed subsequent to the exhaustion of the combined dependable supply from all sources or subsequent to December 31, 1929.

Wyoming Development Company and Wheatland Industrial Company claim that there is no need to determine the dependable supply and that none of the mentioned lands may be excluded from any claim to participation in said combined supply of water from all sources.

#### EIGHTH CAUSE OF ACTION

Paragraphs 1 to 24, inclusive, of the first cause of action are herein incorporated by reference.

Paragraph 25 states that no conveyance of any interest in Reservoir No. 1, adjudicated in said decree, has ever been executed; that the Development Company has never made any effort to determine the

dependable flow of said Sybille Creek for storage in Reservoir No. 1, or to allocate this water to any tracts of the project for the irrigation thereof at the ratio hereinbefore described; that this reservoir was constucted with funds raised by assessments on each landowner under deeds in the form of "Exhibit A"; that: "said reservoir has always been used for the benefit of the entire project; that plaintiffs are unable to say how many of such deeds and for what lands have been executed." Upon these asserted facts the controversy is set forth:

26. Plaintiffs claim that Reservoir No. 1 and the right to store water therein as adjudicated in said decree belongs jointly to owners of lands under said project for which deeds like Exhibit A have been executed and they are entitled to have same included in the project as same may be limited by the District Court.

Wyoming Development Company claims that this reservoir is its exclusive property and that it may use the water therefrom as it sees fit.

### NINTH CAUSE OF ACTION

Here, paragraphs 1 to 35, inclusive, of the fourth cause of action, paragraph 30 of the second cause of action, paragraph 35 of the fourth cause of action, paragraphs 31 and 32 of the first cause of action, and paragraph 34 of the third cause of action are all incorporated by reference as paragraphs 1 to 40, inclusive, of this cause of action.

The controversies claimed to arise in addition to those set out in said paragraphs 35 to 40, inclusive, thus incorporated by reference are:

41. Plaintiffs claim that the Wyoming Development Company and the Wheatland Industrial Company are not entitled to operate or manage said irrigation system as they have no interest in it except as agent of individual owners of the land and water

rights in the project and that, upon request, said companies are required to turn over the management of said irrigation system to the individual owners or such agency as may be formed by them for that purpose.

Wyoming Development Company and Wheatland Industrial Company claim that purchasers of water rights are without title to the irrigation works and that the companies alone can manage and operate the system.

42. Plaintiffs claim that in operating and managing the irrigation system the two companies have always acted as agents or trustees for individual purchasers in which capacity they have always acted in a fiduciary capacity for the individual owners and that the owners are entitled to a full and complete accounting of said companies' operation and management of said irrigation system.

Wyoming Development Company and Wheatland Industrial Company claim that they have never acted as agents or trustees for the individual owners and are under no duty to so account.

43. The Wyoming Development Company and the Wheatland Industrial Company claim they are entitled under the terms of the deeds which they have executed to levy against each parcel of land and recover from the owner thereof a pro rata share of the expense of defending this suit.

Plaintiffs claim the companies aforesaid have no right to do this but such expense must be borne entirely by said companies out of their own funds.

Attached to plaintiff's pleading as thus summarized are thirty-six prayers for relief including costs of this action. These prayers in large measure reflect the claims made on behalf of the plaintiffs as hereinbefore set forth in connection with the several causes of action aforesaid.

The defendants severally interposed demurrers to this amended petition and to its causes of action there-

in incorporated. After argument and briefs submittew, these demurrers were sustained by the District Court; plaintiffs declined to plead further and the result ensued all as noted above.

The first contention urged by the plaintiffs is to the effect that as they have alleged an actual controversy in each of the nine stated causes of action with respect to asserted property rights in the water rights initiated by the Development Company, they have consequently stated a good cause of action for a declaratory judgment which cannot properly be disposed of on general demurrer.

Decisions of a number of appellate courts are cited by plaintiffs wherein it has been held that, generally speaking, an action for declaratory relief should not be disposed of on demurrer: Neubeck v. McDonald, 220 N.Y.S. 761-762 Miller v. Currie, 208 Wis. 676, 242 N.W. 572; Oldham v. Moodie, 94 Cal. App. 88, 270 Pac. 688; City of Cherryvale v. Wilson, 153 Kan. 505, 112 Pac. 2d 111, 115, and Bruckman v. Bruckman Co., 60 Ohio. App. 361, 21 N.E. 2d 481. See also Cabell v. City of Cottage Grove, 170 Ore. 256, 130 Pac. 2d 1013; Maguire v. Hibernia Savings & Loan Society, 23 Cal. 2d 719, 146 Pac. 2d 673, and authorities cited. The position of these courts may very well be lilustrated by what the Supreme Court of Kansas has said in the case of City of Cherryvale v. Wilson, supra, as follows:

"Assuming there is an actual controversy between the parties, the petition should state the facts out of which the controversy arose, should state clearly the view or claim of plaintiff and also state clearly the view or claim of the defendant, and the court should be asked to adjudicate the controversy. The appropriate pleading for defendant to file is an admission that the controversy arose from the facts stated by plaintiff, and that plaintiff's contention is correctly stated; also, that defendant's contention is correctly stated,

if, of course, defendant agrees that the matters are so pleaded. If defendant thinks the facts giving rise to the controversy are not accurate or fully stated, or that the contention of the plaintiff, or that the contention of the defendant, is not accurately or fully stated, his answer should plead the facts and the contentions as he understands them to be. If defendant pleads the facts and the contention is contrary to that pleaded by plaintiff, plaintiff by reply should either admit those, or deny them."

The trend of authority would appear to be indicated by these cases. There are many decisions which have disposed of declaratory actions upon demurrer and such disposition has been affirmed. Our attention has been directed by the defendants herein to the case of General Insurance Co. of America, v. Ham, 49 Wyo. 525, 57 Pac. 2d 671. There a demurrer was interposed to a petition for declaratory relief, the demurrer was overruled and defendant elected to stand upon the question of law thus raised. Judgment below was then entered in favor of the plaintiff. Upon appeal here the action of the trial Court was reversed "with direction to enter judgment for the defendant and dismiss plaintiffs' petition." This Court has never had before it or expressly decided the exact question whether a petition in an action for declaratory relief is defective if the facts set forth disclose that the plaintiff is not entitled to a favorable declaration. Decisions are not authority for points not raised or considered. See Maguire v. Hibernia Savings & Loan Society, supra.

It is, however, to be observed in connection with the ruling in the Cherryvale case, supra, that there a general demurrer that the plaintiffs' petition "did not state facts sufficient to constitute a cause of action" was sustained by the lower court and notwithstanding the views expressed in the excerpt quoted above, the action of the lower court was affirmed. It was indicated on review in that case that it was necessary to

have "an actual controversy" upon facts clearly presented by the pleading, and that as this was not shown:

"The demurrer in this case, however, did raise the question of whether the petition stated a cause of action for a declaratory judgment."

Similarly in State of North Dakota ex rel. Strutz v. Perkins County, ........So. Dak. ........, 9 N.W. 2d 500, the Court, referring to the Uniform Declaratory Judgments Act in force in South Dakota, as in Wyoming, said:,

"The statute in question does not require courts to render advisory opinions or to determine moot or theoretical questions, Security State Bank et al., v. Breen et al., 65 S. D. 640, 277 N.W. 497. It is well settled that an action for a declaratory judgment must involve a controversy of a justiciable character between parties having adverse interests and the party seeking such relief must have a legally protectible interest. 16 Am. Jur., Declaratory Judgments, § 10; State ex rel. La Follette v. Dammann, 220 Wis. 17, 264 N.W. 627, 103 A.L.R. 1089; Langer et al. v. State et al., 69 N.D. 129, 284 N.W. 238."

Wisconsin is another state which has adopted this Uniform Act and in State et rel. La Follette, v. Dammann, 220 Wis. 17, 264 N.W. 627, the Court said:

"The requisite precedent facts or conditions which the courts generally hold must exist in order that declaratory relief may be obtained may be summarized as follows: (1) there must exist a justiciable controversy; that is to say, a controversy in which a claim of right is asserted against one who has an interest in contesting it; (2) the controversy must be between persons whose interests are adverse; (3) the party seeking declaratory relief must have a legal interest in the controversy, that is to say, a legally protectible interest; and (4) the issue involved in the controversy must be ripe for judicial determination. Declaratory Judgments, Borchard, pp. 26-57."

And this also was said:

"The court ordinarily will not decide as to future or contingent rights, but will wait until the event giving rise to rights has happened, or, in other words, until rights have become fixed under an existing state of facts. Miller v. Currie, 208 Wis. 199, 242 N.W. 570, Heller v. Shapiro, 208 Wis. 310, 242 N.W. 174, 87 A.L.R. 1201."

That was an original action brought in the Supreme Court of Wisconsin, for a declaratory judgment. A demurrer to the complaint was filed and the ruling was:

"Because the plaintiff's complaint does not state facts which warrant the rendering of a declaratory judgment and because the uncertainty or controversy would not be terminated, we are impelled to the conclusion that any opinion which we might presently express would be merely advisory.

The demurrer to the complaint is sustained and the petition dismissed."

See also New Amsterdam etc., Co., v. Simpson, 238 Wis. 550, 300 N.W. 367.

The State of North Carolina also has adopted the Uniform Act, aforesaid, and in the case of Town of Tryon v. Duke Power Company, 222 N. C. 200, 22 S.E. 2d 450, this was said concerning this statute:

"Indeed, it is uniformly held both in this country and in England that in the absence of any express provision making the existence of an actual controversy necessary to the jurisdiction, this limitation is nevertheless implied and will be observed by the courts. Cryan's Estate, 301 Pa. 386, 152 A. 675, 71 A.L.R. 1417; Heller v. Shapiro, 208 Wis. 310, 242 N.W. 174, 87 A.L.R. 1201; City and County of Denver v. Lynch, 92 Colo. 102, 18 P. 2d 907, 86 A.L.R. 907; see Annotations 87 A.L.R. 1211, 68 A.L.R. 117, and 50 A.L.R. 45."

In Crank v. McLaughlin, ......... W. Va. ........., 23 S.E. 2d 56, the syllabus of the case by the Court reads:

"Under our 'Uniform Declaratory Judgments Act,' Chapter 26, Acts of the Legislature, 1941, courts may

enter judgments or decrees declaratory of the law, in cases of actual and existing controversies, such as might be the basis of litigation through the ordinary or extraordinary processes of law or equity, and not otherwise."

The view is expressed in the opinion:

"While the declaratory judgment act does not in terms say that there shall be such actual dispute or controversy, it has been universally held that before a court can take jurisdiction under declaratory judgment statutes, there must be an actual and justiciable controversy between the parties to any proceeding of that character. It must necessarily be so under our constitution, because circuit courts are vested with power to take jurisdiction of judicial questions only. Hodges v. Public Service Commission, 110 W. Va. 649, 159 S.E. 834. Therefore, the controversy between the plaintiffs and the defendant in this proceeding must be of such a nature as would warrant a court of law or equity in taking jurisdiction, if the same were asserted in some other proceeding."

There an order overruling a demurrer to a petition for declaratory relief was reversed and the cause was dismissed by the appellate court on the ground that the petition failed to show a justiciable interest in the plaintiffs.

It is declared in Hickey v. City of Portland, Oregon, 165 Or. 594, 109 Pac. 2d 594, after reviewing authorities cited by plaintiffs, that it was the opinion of the Court:

"* * * it is a jurisdictional pre-requisite in cases of this character that the petition disclose a justiciable controversy."

The lower court had sustained a demurrer to the petition for a declaratory judgment and this ruling was affirmed. The State of Oregon, too, has enacted the Uniform law aforesaid.

From these authorities it is fairly to be concluded that in order that the operation of the Declaratory

Judgments Act may be invoked it is necessary that there should be a justiciable controversy; also, that if it appears on the face of the pleading that no such controversy is presented, a general demurrer is proper for no cause of action is stated under the Act.

So far as the present litigation is concerned both parties have submitted briefs and arguments dealing with the question whether the statute of limitations and the equity principle of laches may be raised under a general demurrer, to a petition of the character now before us, and, also, whether these, points may be regarded as properly applicable here.

In Cowhick v. Shingle, 5 Wyo. 87, 37 Pac. 689, this Court stated that:

"It is the settled construction of our Code of Civil Procedure that 'where it appears on the face of the petition that the cause of action accrued at such a period that under the statute of limitations no action can be brought, the defendant may demur to the petition on the ground that the petition does not state facts sufficient to constitute a cause of action.' Sturgis et al. v. Burton et al., 8 Ohio St., 215."

See also to the same effect, Columbia Savings and Loan Association v. Clause, 13 Wyo. 166, 76 Pac. 708.

Asserting that the defendant city had entered into an illegal contract, the plaintiff, in Hencken v. City of Morgan Hill, 21 Cal. App. 2d 438, 69 Pac. 2d 462, brought his action to have it so declared and for other relief. The defendant filed a general demurrer to plaintiff's amended complaint. The demurrer was sustained without leave to amend and judgment was entered for the city. On appeal from this judgment the Court said, in the course of its opinion, that:

"Moreover, the complaint does not present facts showing why a court of equity should entertain it. The plaintiff alleges that at all times he was a resident and taxpayer of the city of Morgan Hill. He

knew, or in the exercise of ordinary care should have known, the transactions of the board of trustees of the defendant city. No fact is alleged showing he did not have such knowledge. The contract was executed May 7, 1930. This action was not commenced until March, 1936. In the meantime the defendant city has made payments of a total sum of $12,485. No part of those payments is alleged to be invalid excepting $2,800. The wrongful payment of that sum, if it was wrongful, was committed six years ago. The plaintiff's cause of action, if he had one, is clearly barred by his laches. Garrity v. Miller, 204 Cal. 454, 268 P. 622."

In this case a re-hearing was denied and the Supreme Court of California declined to review the decision.

The recent case of Maguire v. Hibernia, etc., Society, supra, considered a contention on the part of the plaintiffs there that a demurrer could not properly be sustained to a petition for declaratory relief. This view the Supreme Court of California declined to accept. It was pointed out also that in Moss v. Moss, 20 Cal. 2d 640, 128 Pac. 2d 526, the Court had theretofore held that:

"* * * a trial court does not commit reversible error when in ruling on demurrer it exercises its discretion and refuses declaratory relief to a party of equal fault to an illegal transaction."

In the Maguire case, while it was decided that it did not appear from the face of the pleading attacked that the two causes of action therein set forth were barred by the statute of limitations or by laches, the Court specifically declared:

"We are of the opinion that the period of limitations applicable to ordinary actions at law and suits in equity should be applied in like manner to actions for declaratory relief. Thus, if declaratory relief is sought with reference to an obligation which has been breached and the right to commence an action for 'co-

ercive' relief upon the cause of action arising therefrom is barred by the statute, the right to declaratory relief is likewise barred."

In the course of the discussion of the matter attention was directed to the fact that where, in the law of California, no definite limitation of action is prescribed, a four year limitation is fixed for "an action for relief not hereinbefore provided for," (Section 343, Code Civ. Proc. Cal.). The State of Wyoming has a similar law, also, except that the limitations period is fixed at ten years. See Sec. 89-414 W.R.S. 1931.

It is a fair inference, we think, that there is no justiciable controversy as contemplated by the Declaratory Judgments Act, aforesaid, where it appears on the face of the pleading that the facts alleged disclose that either the statute of limitations or the doctrine of laches is applicable thereto. It has been intimated that this is true likewise in regard to issues which the party who attempts to raise them is estopped to contest. Timken-Detroit Axle Co. v. Alma Motor Co., 47 Fed. Supp., 582. It would seem therefore to logically follow that these points could properly be raised by general demurrer. Any other view would apparentlead to the position that the Act aforesaid could be used to circumvent the statutes for the limitation of actions, and the well established principle of laches. Undoubtedly the Uniform Declaratory Judgments Act was never placed in the body of our law for any such purpose. In this connection it is well to recall also that, as stated in 2 Pomeroy's Eq. Juris. (5th Ed.) 174-5, Sec. 419 b:

"The applicability of statutes of limitation to equitable proceedings appears to be unquestioned in most jurisdictions in which distinctions between legal and equitable forms of action have been abolished."

That an action for declaratory relief is essentially equitable in character has been pointed out in Morris

v. Ellis, 221 Wis. 307, 266 N.W. 921, and this Court has likewise so intimated in Holly Sugar Corp. v. Fritzler, 42 Wyo. 446, 296 Pac. 206.

Other pertinent general principles applicable to actions of this character may be here properly mentioned. In Seize v. Citizens Pure Ice Co., 207 Minn. 277, 290 N.W. 802, the Court declared that:

"Proceedings for a declaratory judgment must be based on an actual controversy. The controversy must be justiciable in the sense that it involves definite and concrete assertions of right and the contest thereof touching the legal relations of parties having adverse interests in the matter with respect to which the declaration is sought, and must admit of specific relief by a decree or judgment of a specific character as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. Mere differences of opinion with respect to the rights of parties do not constitute such a controversy. This court of its own motion will reverse for want of jurisdiction of the subject matter where it appears there is no real controversy on the grounds that there is no proper case for a declaratory judgment and the judicial function does not comprehend the giving of advisory opinions."

Section 6 of the Uniform Declaratory Judgments Act provides:

"The court may refuse to render or enter a declaratory judgment or decree where such judgment or decree, if rendered or entered, would not terminate the uncertainty or controversy giving rise to the proceeding."

And this is our Section 89-2406, W.R.S. 1931. Concerning this section this Court has said in Ziegler v. Pickett, 46 Wyo. 283, 25 Pac. 2d 391:

"This section evidently means that a declaration may be refused unless it appears that a decision, whichever way it may go, will terminate the uncertainty or controversy. See Lewis v. Green, (1905) 2 Ch. 340."

See also Smithberger v. Banning, 130 Nebr. 354, 265 N.W. 10; Miller v. Miller, 149 Tenn. 463, 261 S.W. 965.

16 Am. Juris. 295-6, Sec. 23, says that:

"Questions already adjudicated by a court having jurisdiction of the subject matter and the parties cannot thereafter be the subject, between such parties and their privies, of an actual controversy within the meaning of this term in the Declaratory Judgments Act. The act is not intended to be used to elucidate or interpret judicial decrees or judgments already entered or to modify or declare rights thereunder."

See also 1 C.J.S., Sec. 18, page 1036.

The application of the foregoing authorities and the views above expressed will appear in connection with our discussion of the controversies claimed to have arisen upon the several stated causes of action hereinbefore reviewed. Before passing to that discussion, it should be noted that the petition in this cause was filed September 18, 1940, in the office of the Clerk of the District Court, of Platte County, and the amended petition was filed there November 7, 1941. The several demurrers of the defendants to the said amended petition were sustained August 17th, and 21st, 1942, respectively. The judgment of dismissal of the action was dated September 29, 1942, and entered October 1st, following.

CONTROVERSIES ASSERTED THROUGH THE

FIRST AND SECOND CAUSES OF ACTION

The material facts to be gleaned from the averments of the first cause of action of the pleading aforesaid appear to be, briefly stated, that the Development Company, about May 18, 1883, owned or was acquiring a large body of land in what was then Laramie County, but which subsequently became Platte County, Wyo-

ming. At that time the corporation last named had commenced the construction of a large irrigation system. Parenthetically, it may here be remarked that the size, importance, and utility of this project have been quite fully elaborated by the opinion filed heretofore in Campbell v. Wyoming Development Company, 55 Wyo. 347, 403-406, 100 Pac. 2d 124.

On December 27, 1912, the District Court of Laramie County, adjudicated certain water appropriattions and among them those of the Development Company, from the Laramie River and its tributaries. From the Laramie River 633 cubic feet per second and from Sybille Creek, a tributary thereof, 125 cubic feet per second, the last mentioned appropriation being stated as supplemental to the river supply, were awarded to that company. It appears that this corporation has, in times past, sold these lands to sundry purchasers under deeds or contracts in the form of "Exhibit A," more particularly hereinabove described, together with a "perpetual water right" attached thereto, which was defined in said deeds or contracts as "a quantity of water which shall be in the same ratio to the whole of said Wyoming Development Company's water appropriation" with certain appropriations excepted as already hereinabove described "as the number of acres," in the lands conveyed bore "to the number of acres in the whole of the lands which are capable of being irrigated by" the Development Company's system established prior to June 1, 1894.

At this point it may be especially noted that the water to be received under these instruments by the several purchasers of the tracts of land thus sold was a proportionate amount only—and not a fixed number of second feet of water for a stated acreage but which necessarily varied as the acreage of the project was

brought under irrigation and it appeared what lands were capable of irrigation; that it does not appear that the Development Company has failed to supply to plaintiffs this proportionate amount of water for their lands as contracted; that plaintiffs as listed in "Exhibit B" in the irrigation of these lands owned by them have made benefcial use of the available water under the direct flow rights appropriated by the Development Company from the Laramie River and the Sybille Creek as described in the decree of 1912, aforesaid.

It should be remembered also that at the time the appropriation rights of the Development Company were initiated, and until the year 1909, it was the law that a water right acquired by prior appropriation for irrigation was a property right and as such might be sold and conveyed separate from the land to which it was first applied, the only limitation upon this principle being as stated in Johnston et al. v. The Little Horse Creek Irrigation Company, 13 Wyo. 208, 79 Pac. 22:

"* * * that it shall not injuriously affect the rights of other appropriators. In other words, the burden upon the use must not be enlarged beyond that which rested upon it under the original appropriation and while in the hands of the original appropriator as he was entitled to and did use it."

This Court in that case said:

"It is not denied, nor can it be, that it has uniformly been held in this country, wherever the doctrine of prior appropriation is recognized, that a water right obtained by and for the irrigation of land may be sold separate therefrom." (Citing authorities).

With these salient facts before us we think it apparent that there is no justiciable controversy arising out of the alleged claims of the parties as set forth in paragraph 28, aforesaid, of the first cause of action.

The 1912 decree above mentioned found in favor of, and adjudicated to, the Development Company, the right to take 633 cubic feet of water from the direct flow of the Laramie River and 135 cubic feet of water from Sybille Creek, and to apply this water to a beneficial use with reasonable diligence. This requirement has been complied with so far as the lands of the plaintiffs are concerned as we understand plaintiffs' pleading. The facts therein alleged disclose no disagreement between the parties as to plaintiffs' right to use the proportionate amount of water conveyed to them under their contracts of purchase from the Development Company. Neither do these facts indicate that the Development Company asserts it may take the water thus appropriated and thus applied to plaintiff's lands and apply it to other lands which it owns or which other purchasers own. We have no contest over priorities in water appropriations or abandonment of rights now before us. Plaintiffs claim they are entitled to the water they are receiving and have received through the Development Company's appropriation and its adjudicated priority. It is evident that a claim that an actual or justiciable controversy exists must be based upon facts pleaded or established.

In Ohio Casualty Ins. Co. v. Marr, 98 Fed. 2d 973, the Tenth Circuit Court of Appeals in affirming the dismissal of an action for a declaratory judgment remarked that:

"Failing to charge that an accident occurred, the bill did not set forth facts constituting a present, real, definite, and substantial controversy; it did not present a justiciable question touching the legal relations of the parties. The charge that such a controversy existed without averring facts constituting it was only a conclusion. The pleading failed to state a cause for action and called for dismissal on that ground; * * *."

The National Supreme Court declined to review this ruling, refusing certiorari, 305 U. S. 652, 59 S. Ct.

245, 83 L. Ed. 422. See also Hencken v. City of Morgan Hill, supra.

It is asserted that the Development Company must, under the decree of 1912 aforesaid, perform the duty of determining the amount of lands capable of irrigation by means of a *dependable* supply of water from the Laramie River and Sybille Creek, and thereupon that Company should apply that water, one cubic foot per seventy acres, within the acreage described in said decree. An examination of the decree as pleaded discloses no such duty imposed upon the Development Company. We are not permitted to read into that pronouncement, provisions which do not appear therein, and this is particularly so since the judicial action therein recorded has never been challenged since its entry more than thirty years ago. Attention has above been called to the principle that an action for a declaratory judgment may not be invoked to modify a judicial decree or judgment.

The phrase "dependable supply of water" appears throughout plaintiffs' amended pleading. What is meant we do not know. Plaintiffs do not tell us. We have searched the authorities, relative to irrigation law for a definition thereof, but with no results. Even the word "dependable" as applied to a water supply in this, the semi-arid plateau of this country, cannot be found in so complete and well-known a work as "Words and Phrases." Webster's New International Dictionary defines the word "dependable" as meaning "trustworthy" or "reliable." The Century Dictionary supplies us with the same definition. We think it is common knowledge that, in this and other states similarly situated, periods of time occasionally extending over a number of years will see an abundance of water for irrigation purposes flowing in the streams while other like periods will show exactly the opposite situ-

ation, i. e., a scanty water supply even though human efforts to conserve such supply are exerted with the best and most approved engineering skill. This is true of even the larger rivers in this section of the country but it is especially true of the smaller streams and their tributaries, such as the Laramie River and Sybille Creek, the water supply sources in the litigation before us. We are obliged to conclude that to require either the Development Company or the District Court of Platte County, to determine what a "trustworthy" or "reliable" supply of water is, with relation to the water sources here involved, would present insuperable difficulties. If such an amount was attempted to be fixed, as the result of skilled observation during one year, or a series of years, either drouth of abundance of supply for the subsequent irrigation seasons as uncontrollable natural causes might dictate, would render such determination utterly valueless and would be productive of unending controversy between water users.

The contention that the Development Company should assign to the acreage included in the 1912 decree, a water supply of one cubic foot per second for each seventy acres is, we think, quite untenable for several reasons. Our attention is not directed to any provisions of the contract between the parties or any statutory direction requiring any such action on the part of the company. Again, the duty of water as prescribed by Sec. 25, of Ch. 8, Laws of Wyo. 1890-1, was that "no allotment shall *exceed* one cubic foot per second for each seventy acres of land for which said appropriation shall be made." (Italics supplied.) This language has since been somewhat altered by the interpolation of the words "for the direct use of the natural unstored flow of any stream" between the word "allotment" and the words "shall exceed" etc. See Sec. 122-117 W.R.S. 1931. For the Development Company

to make the allotment suggested might be both productive of waste of water and be in contravention of the fundamental principle of irrigation law which requires water to be used in the most effective and efficient manner practically possible.

It is urged that when the Development Company delivered deeds to the plaintiffs and others in the form of "Exhibit A," supra, it conveyed to them not only a proportionate perpetual water right as well as the lands upon which it was to be used, but also proportionate interests in all the diversion irrigation works, canals, and ditches constructed by the Development Company for conveyance of the water to the place where it would be used, and that the purchasers, plaintiffs and defendants alike, now own these facilities. An examination of the deed forms aforesaid evidences no such transfer. The parties made their own contracts and we are not authorized to read into them terms that are not incorporated therein. All parties hereto, including the plaintiffs, by their acts under these deeds or contracts, for many years have construed them quite otherwise than the interpretation now insisted upon. Even at the present time it is apparent that the overwhelming majority of those who hold deeds or contracts of this character do not approve of this contention but acquiesce in the view that the Development Company still owns and should control and operate these facilities.

Our attention has been directed to no authorities or to no statutory law which would justify any such interpretation of these deeds or contracts as plaintiffs claim and we have discovered none after search. We may say that we have examined with care all the adjudicated cases as well as excerpts from cases and well known texts on irrigation law urged as controlling or of aid in plaintiffs' behalf, but find none of

them in point. We note many decisions are cited from other jurisdictions dealing with irrigation projects which have been constructed under the well known provisions of and contracts drawn pursuant to the so-called Carey Act law. The projects here involved, so far as the direct flow of the waters of the Laramie River and Sybille Creek are concerned, was initiated long before the Carey Act was passed by Congress, August 18, 1894, and accepted by the State of Wyoming, February 14, 1895. (Ch. 38, Sec. 1, Laws of Wyo. 1895). And, neither Reservoir No. 1, or Reservoir No. 2, above mentioned, were constructed in accordance with that law. It may here be noted that Sec. 7, of Ch. 38, Laws of Wyo. 1895, in terms provided that the sale of water rights under said Carey Act should "embrace a proportionate interest in the canal or other irrigation works together with all rights and franchises attached thereto." This language is carried forward in subsequent compilations of our statutes and now appears in Sec. 91-707, W.R.S. 1931. Some enlargement permits relative to Reservoir No. 2 were, in the years 1904 and 1907, issued to the Industrial Company in connection with a proposed Carey Act Project, but that feature of this litigation will be considered subsequently herein.

Even if what has been said in the last two paragraphs were not so it is clear, as we think, that plaintiffs' claim in this particular is subject to the doctrine of laches. In all the years since they were constructed, no one, except the operating companies, has ever been in possession of these irrigation works, and plaintiffs have stood by and observed these corporations and their agents protecting, caring for, and operating them, with the acquiescence of everyone concerned, over a period far beyond the ten years limitation of actions statute. Under all the circumstances presented it seems to us that it would be most inequitable at

this time to take these properties from the operating companies.

In addition to the material facts reviewed above as to the stated first cause of action, and which are to be considered as repeated relative to the second stated cause of action, the latter asserts, on information and belief that the Development Company has delivered deeds to "more than 35,000 acres of the land described" in the 1912 decree aforesaid. It is averred also that the Laramie River and Sybille Creek at times "carry a quantity of water considerably in excess of that required to satisfy the above mentioned rights from said streams" but that, at times, the direct flow of these streams is below the amount necessary to supply the demands created by such sales; that the Development Company "in times of such shortage divides the quantity of water available among all the landowners making a demand for same" and "each owner receives a proportionate amount of the available supply" of water. Complaint is made that the Development Company attempts to sell and in some instances not enumerated has sold additional lands described in said decree under deed form "Exhibit A," supra, with the asserted ensuing result of increased shortage of water supply for those who held and now hold deeds or contracts from the Development Company in the aforesaid form. It would seem the same untenable complaint could have been urged when only a part of the plaintiffs had received their deeds.

We are unable to perceive how, under the contract embodied in "Exhibit A," the Development Company could do otherwise than what it is alleged to have done and to be doing. If at times there is a shortage of water supply and at other times there is a "considerable" excess thereof to supply all the lands included in the decree and capable of irrigation, it is

certainly equitable to divide the water under both these situations proportionately as needed for beneficial use on the lands involved. Nothing in the contract "Exhibit A" requires the Development Company to do otherwise as we see it.

When purchasers under these contracts accepted them they agreed to receive a ratable and proportionate water supply as stated therein. They were not obliged to purchase these tracts of land. They could easily have ascertained whether, under this arrangement there might always be a shortage of direct flow water at the "crucial part of the irrigation season." We are not advised how the courts could relieve against consequences due to variable natural causes. Additionally, we are unable to see why the Development Company, under contracts of this character, might not sell other lands thus embraced in said decree even though at times this might produce a reduction of the actual available water which owners who already hold these contracts would receive. All parties, when they accepted their contracts drawn with provisions such as appear therein must have understood exactly what would happen in years of drought and scanty water supply.

The claims of controversy under the second cause of action are all based upon the proposed determination of a "dependable" water supply above mentioned. What has been already said regarding such a supply is here applicable and need not be reiterated. These claims appear also to be based upon contingencies and not upon existing disagreements, and, as said in Tanner v. Boynton Lumber Co., 98 N.J.E. 85, 129 At. 617:

"This court, even under the provisions of the Uniform Declaratory Judgments Act, should not undertake to decide or declare the rights or status of parties upon a state of facts which is future, contingent, and uncertain."

We are obliged to conclude that the first and second causes of action are each vulnerable to attack by general demurrer.

## CONTROVERSIES ASSERTED THROUGH THE
### THIRD AND FOURTH CAUSES OF ACTION

These two stated causes of action deal with Wyoming Development Company's Reservoir No. 2, and reiterate as we have seen, paragraphs 1 to 24 of the first cause of action. They supplement them as we view the pertinent facts alleged as follows: About January 29, 1898, the Development Company obtained from the State Engineer of Wyoming, Permit No. 1724, for a reservoir to augment the water supply procured as above described from the direct flow sources of the Laramie River and Sybille Creek and also Reservoir No. 1, for the lands lying under and to be irrigated from the original project as well as some additional lands in the vicinity not included in that project. This additional acreage thus provided for appears to be some 4,747 acres, or a total of 63,560 acres. In order to accomplish this purpose the Development Company, from time to time, delivered deeds or contracts in form "Exhibit C" to each of the purchasers holding the aforesaid "Exhibit A" contracts. "Exhibit C" contracts were also given to owners of lands included in said permit but not embraced in the original system. The water supply to be furnished each purchaser under this contract from all sources is described as hereinbefore summarized, but it may be recalled now that the amount of water to be supplied thereunder was not to exceed the amount allowed to be appropriated for the land under Wyoming law and also not to exceed a stated ratable and proportionate supply.

The right of diversion and storage for this Reservoir No. 2 was not adjudicated by the 1912 decree but was expressly excepted therefrom. The operating companies have not attempted to determine the "dependable" flow of Laramie River "available for appropriation and storage in Reservoir No. 2" or to allocate this stored water to any specific tract of said project lands for the irrigation thereof with "one cubic foot of water per second of time per seventy acres" otherwise than is provided by these contracts. It is asserted in consequence that both plaintiffs' and defendants' rights are "vague and uncertain," and that plaintiffs and many of defendants cannot demand or receive the water they should have under their contracts aforesaid and the laws of Wyoming.

It is stated upon information and belief that the Development Company has already delivered to purchasers thereof deeds in the form of "Exhibit C," aforesaid, to purchasers for more than 42,500 acres for water to be supplied from Reservoir No. 2. The Industrial Company, during the last ten years, has sold rights to the use of water in said Reservoir No. 2, with the result of increasing demands upon the available quantity of water and decreasing the amount available to the present owners. So far as can be ascertained from the pleading these lands are embraced within the 63,560 acres covered by Permit No. 1724 for Reservoir No. 2. That this is so would appear to be confirmed by the map "Exhibit E," hereinafter mentioned, and the statements in the pleading regarding it as reviewed hereinbefore.

About April 19, 1940, the operating companies applied for a secondary enlargement permit relative to Reservoir No. 2. This application and permit, as the map accompanying same, approved by the State Engineer of Wyoming, "Exhibit E," discloses, was merely

to clarify the records of that official, to eliminate duplication of acreage and to limit the maximum acreage under said application, to the 63,560 acreage "set forth in primary Permit No. 1724" (the No. 2 Reservoir Permit).

In connection with the alleged controversies which arise relative to the furnishing of water to plaintiffs and others from this Reservoir it may be well to review briefly the Laws of Wyoming relative to the use of water from such conservation works.

When Permit No. 1724 was issued in January, 1898, by the State Engineer of Wyoming, for the construction of Reservoir No. 2, and the storage of water from the Laramie River, for use in the irrigation of certain described lands totaling some 63,560 acres, there appears to have been no legislation controlling the establishment and use of storage reservoirs except Sections 1343 and 1355, of the Revised Statutes of Wyoming Territory, in force January 1, 1887, which are rescripts of Sections 13 and 25, of Ch. 61, Laws of Wyoming Territory, 1886, and certain provisions of Chapter 55, Laws of Wyoming Territory, 1888, notably Sections 11, 12 and 14 thereof. Section 48, Laws of Wyo. 1890-1, required the approval of the State Engineer when a dam for reservoir purposes was erected and exceeded a stated height. These enactments do not materially aid us here though no restrictions are therein found as to the use of water from reservoirs constructed for storage purposes.

Chapter 69, Laws of Wyo. 1903, appears to be the first law in this state which defined what an application for a permit to construct a reservoir in Wyoming should contain. Section 1 of that chapter, after requiring such an application to be made, provides that:

"The application must set forth the name and post-office address of the applicant; the source of the water supply; the nature of the proposed use; the location and description of the proposed work; the time within which it is proposed to begin construction, and the time required for the completion of construction."

Upon inspection of this language it is to be observed that there is an entire absence of requirement that a list of the lands to be irrigated from the proposed reservoir should be supplied. Section 2 of the same law makes this omission more emphatic by the affirmative statement, "that an enumeration of any lands proposed to be irrigated under this act shall not be required." This last provision was carried forward in the amendment of said Section 2 by Section 16 of Ch. 86, Laws of Wyo. 1907, and now appears in Sec. 122-1501 W.R.S. 1931, and also the amendment of that section contained in Ch. 59, Laws of Wyo. 1939. However, in both the amendments aforesaid and in the aforesaid section of the W.R.S. 1931, after the word "required," is added the phrase "in the primary permit." Provision is then made in these later enactments for a secondary permit to be issued to the party applying the reservoir water to a beneficial use with relation to particular lands.

Sec. 7 of Ch. 69, Laws of Wyo. 1903, declares:

"The use of water stored under the provisions of this act may be acquired on such terms as shall be agreed upon by and between the parties in interest; * * *."

The same sentence appears in Sec. 122-1508, W.R.S. 1931, the word "acquired" being changed to "required," the change being very likely due to a clerical mistake in proof reading. Relative to this matter of reservoir law may also be observed the language of Sec. 122-1602, W.R.S. 1931, which was originally enacted as Sec. 2 of Ch. 141, Laws of Wyo., 1921. It reads:

"The reservoir water and rights acquired under reservoir permits and adjudications shall not attach to any particular lands except by deed, or other sufficient instrument conveying such water or water rights, executed by the owner or owners of such reservoir, and such water and water rights, except when attached to particular lands as aforesaid, may be sold, leased, transferred and used in such manner and upon such lands as the owner of such rights or partial rights may desire; provided, that such water must be used for beneficial purposes."

It is contended that Sec. 1 of Ch. 45, Laws of Wyo. 1895, required permits for reservoirs and storage water to incorporate a description of the lands to be irrigated thereby and that:

"If it be held that the water appropriated under such a permit may be applied to any lands that the appropriator sees fit, the whole purpose of the statute in requiring them to be described in the permit is thwarted."

The language relied on reads:

"In case the proposed right of use is for agricultural purposes, the application shall give the legal subdivisions of land proposed to be irrigated, with the total acreage to be reclaimed, as near as may be."

In this view of the statute we think plaintiffs are mistaken and have overlooked that the lawmaking body was legislating for permits relative to the direct flow of stream rights and not concerning storage and reservoir rights. Preceding the quoted language, supra, the statute reads:

"Any person, association, or corporation, hereafter intending to acquire the right to the beneficial use of the public water of the state of Wyoming, shall, before commencing the construction, enlargement, or extension of any *ditch, canal or other distributing works,* or performing any work in connection with said construction, or proposed appropriation, make an application to the state engineer for a permit to make such appropriation." (Italics supplied).

A reservoir is neither a ditch, canal, or a "distributing work." In aid of this view is the statutory construction principle of "ejusdem generis." 59 C.J. 981, 982, Sec. 581, on the authority of an elaborate list of cases, says that:

"By the rule of construction known as 'ejusdem generis,' where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated, * * * The words 'other' or 'any other' following an enumeration of particular classes are therefore to be read as 'other such like,' and to include only others of like kind or character."

If further support of our understanding of the intent of the law were needed it is to be found in a subsequent paragraph of the same section in Ch. 45, supra, which directs that:

"Before either approving or rejecting an application, the state engineer may require such additional information as will enable him to properly guard the public interests, and may, *in the case of applications proposing to divert more than twentyfive cubic feet of water per second of time,* or to reclaim over one thousand acres of land, require a statement of the following facts." (Italics supplied).

The italicized words in the paragraph just quoted refer to the measurement of direct flow rights.

It will not be necessary here to recite in detail the alleged claims of controversy upon the facts alleged concerning Reservoir No. 2, that have hereinbefore been set out. It is apparent that they center about plaintiffs' theory that there must be a determination of a stated "dependable" supply of water from said reservoir. What has been hereinbefore said about that theory relative to the direct flow rights from the sources of water supply, the Laramie River and Sybille Creek is quite as applicable to the constantly variable

conditions prevailing relative to said reservoir. That method of conservation of water supply must necessarily vary greatly as do the sources of that supply. At times it may be well filled and at others nearly empty.

Relative to the claim that the operating companies no longer own the reservoir as a result of the conveyances made in the form of "Exhibit C," and that the plaintiffs are the owners thereof, it is sufficient to say that the terminology of those contracts does not so provide and no law of this state is called to our attention which would require us to read into those instruments such consequences. Neither are there any decisions from other jurisdictions which have statutory law similar to ours and present facts such as are pleaded here, submitted, which would lead us to entertain plaintiffs' view of this matter. It would appear that the distinctive feature about this case is that the operating companies originally owned the lands involved, (except the Bordeaux Carey Act Project lands), and at the very least took all the preliminary steps necessary to secure a supply of water for irrigating them. In many instances it is evident they still hold lands on which water has been duly applied to a beneficial use. Further, it should not be overlooked that all the plaintiffs are entitled to, from this stored water, is a ratable and proportionate supply as dictated by the contracts they accepted.

It is urged that the operating companies claim that they could use the reservoir water on lands not included in the Permit No. 1724, but no facts are set forth to support the view that they are making any such claim. The Swan Company is mentioned as asserting a right to a stated water supply from Reservoir No. 2, but the situation of that company is dealt with by plaintiffs in the alleged cause of action numbered

six and will be subsequently herein considered. There would appear to be no justiciable controversies disclosed by these two alleged causes of action which the court below could properly or at all terminate by a declaratory judgment.

## CONTROVERSIES ASSERTED THROUGH THE FIFTH CAUSE OF ACTION

This stated cause of action involves the Wheatland Industrial Company in a plan for supplying water to what is known as the Bordeaux Carey Act Project. It appears that about October 15, 1904, the Industrial Company secured from the State Engineer of Wyoming, Permit No. 1276 Enl., wherein lands totaling 7,543.51 acres are described, and about April 18, 1907, another Permit No. 1681 Enl., was also obtained by said company from that official. In the permit last mentioned it is averred that lands totaling 2,381 acres are listed. These permits designate Reservoir No. 2, aforesaid, as the source of the supply of water to be used on said lands, and the permits describe the irrigation works contemplated as an enlargement and extension of Wyoming Development Company's Canal No. 1. These lands are not apparently included in the 63,560 acres originally covered by Permit No. 1724. It is asserted that the Industrial Company has issued contracts for the sale of water for the irrigation of approximately 2,500 acres of irrigable lands in said project. Only not to exceed one-half a cubic foot per second for each 35 acres, is allotted to the lands thus involved and this allotment is further qualified by a ratable and proportionate distribution of the water supplied as stated in the form of contract employed and already hereinabove reviewed. That form of contract, as is usual, purports to convey to the holder thereof an interest in Reservoir No. 2. It is nowhere

alleged in this stated cause of action that the Reservoir No. 2 does not have sufficient capacity to furnish the water contracted for over and above the capacity necessary to meet the demands of the irrigable acreage in the 63,560 acreage total. The State Engineer evidently thought it was sufficient to do so or that the irrigable acreage called for under this Carey Act Project was merely substituted for some of the non-irrigable acreage mentioned included in the 63,560 total aforesaid. Otherwise the permits for enlarging the canal which was to carry this water to the land affected would doubtless never have been issued. It may well be also that Reservoir No. 2, was duly enlarged to meet the increased demand of these permits. How plaintiffs are injured by these acts of the Industrial Company we do not find clearly set forth.

It is not averred, either, that the irrigable acreage of the lands described in these two permits, when added to the irrigable acreage of the lands described under Permit No. 1724, exceeds the maximum of 63,560 acres assigned to that permit. Under the administrative law concerning storage water, as hereinabove examined, no reason appears why irrigable acreage under this Carey Act Project should not be substituted for non-irrigable acreage under Permit No. 1724. Further, under the law governing the use of reservoir water in this state, as we have found it to be, and the circumstances presented by the pleading relative to this matter, we are unable to see how any actual controversy has arisen relative to this project between plaintiffs and the defendants holding these Carey Act contracts. Certainly, if Reservoir No. 2, has sufficient capacity, as we must assume it has, either through its original construction or subsequent enlargement, to hold a supply of the necessary water,

and the means of carrying that water have been enlarged so that it could be transported to the lands in question, we fail to perceive how the plaintiffs' rights have been infringed. Even at present the owner of a reservoir has a right, as we have seen, to contract with others in interest as to the use of storage water "under such terms as shall be agreed upon." We hardly see why that might not be done when there was no law in existence governing the matter.

Plaintiffs seek to have the Court cut some twenty-five listed defendants from obtaining water for their lands under this Carey Act project. We have no hesitation in saying that this should not be done. The plaintiffs or their predecessors in interest have stood by and observed these acts of the Industrial Company and their grantees, in their attempts, through the expenditure of money and labor, to transform arid waste land into productive fields, all to the benefit of the state and its citizens, over a period of many years and far beyond the ten years statutory limitation of action period. So, aside from what has been said above regarding this matter, we think that the doctrine of laches may properly be invoked against this alleged cause of action as appearing from the face of its averments.

This Court in Binning v. Miller, 55 Wyo. 478, 510; 102 Pac. 2d 64, indicated that laches has been defined:
"* * * as delay in enforcing one's right which works disadvantage to another; that it is in the nature of an equitable estoppel. 21 C.J. 211, and note."

30 C.J.S. 520, Sec. 112, succinctly says that "laches is such delay in enforcing one's rights as works disadvantage to another." And Mr. Justice Brewer, speaking of the defense of laches in Halstead v. Grinnan, 152 U. S. 413, 14 S. Ct. 641, 38 L. Ed. 495, very well said:

"The defense itself is one which, wisely administered, is of great public utility, in that it prevents the breaking up of relations and situations long acquiesced in, and thus induces confidence in the stability of what is, and a willingness to improve property in possession; and at the same time it certainly works in furtherance of justice, for so strong is the desire of every man to have the full enjoyment of all that is his, that, when a party comes into court and asserts that he has been for many years the owner of certain rights, of whose existence he has had full knowledge and yet has never attempted to enforce them, there is a strong persuasion that, if all the facts were known, it would be found that his alleged rights never existed, or had long since ceased. * * * The length of time during which the party neglects the assertion of his rights, which must pass in order to show laches, varies with the peculiar circumstances of each case, and is not, like the matter of limitations, subject to an arbitrary rule. It is an equitable defense, controlled by equitable considerations, and the lapse of time must be so great, and the relations of the defendant to the rights such, that it would be inequitable to permit the plaintiff to now assert them."

### CONTROVERSIES ASSERTED THROUGH THE
### SIXTH CAUSE OF ACTION

This stated cause of action is an attack upon a contract between The Swan Land and Cattle Company Ltd., a corporation then existing under the laws of the United Kingdom of Great Britain and Ireland, and authorized to do business in the State of Wyoming, and the Development Company. The successor to the corporation first named is now known as The Swan Company, a Delaware Corporation. Briefly, this contract is a lease of some 6,000 acres of land owned by this foreign corporation, aforesaid, which may be designated as the lessor, to the Development Company as lessee. Upon these lands is located the latter's Reservoir No. 2. The consideration for this lease is an

agreement on the part of the lessee to furnish to the lessor certain water from Sybille Creek, designated as a part of the irrigation system of said lessee, this water, or water right, being a part of a lawful appropriation of water made theretofore by the Development Company. The amount of water thus contracted for is the amount the lessor's two ditches, known as the Two Bar and Mule Shoe, and whose dimensions are stated, can carry for the irrigation of certain lands of the lessor which are capable of irrigation; as additional consideration for this lease the lessee agrees to furnish water from the said Sybille Creek as shall be sufficient to irrigate 300 acres to be used upon lands selected by lessor. The term of this lease is stated to be for such period as said demised lands shall be used for reservoir purposes for supplying the irrigation system of the lessee with water. This contract was made, as counsel for The Swan Company claim, March 1, 1900. This fact does not appear to be disputed by plaintiffs and is, indeed confirmed by the statement in paragraph 36 of this cause of action that the lessor has used the water thus contracted for, for "over forty years."

This water which passes into Sybille Creek for these uses appears to be taken from the Reservoir No. 2, aforesaid. It is averred that The Swan Company does not own any lands described in said Permit No. 1724 for Reservoir No. 2, and it is accordingly insisted that The Swan Company has no right to this water as a consequence.

It is to be observed in this connection that neither The Swan Company nor the Development Company, the parties to the lease, appear to be dissatisfied with the arrangement thus made. The many defendants who are similarly situated with the plaintiff are not voicing their dissatisfaction with it. The State of Wyo-

ming appears never to have questioned the disposal of the water to The Swan Company by the Development Company as thus agreed. The plaintiffs, themselves, through their contracts in the form of "Exhibit C," have had the use of the Reservoir No. 2 water supply, and, until the institution of this litigation have never questioned the acts of the Development Company and The Swan Company under said contract. It would appear that plaintiffs desire to retain the benefit of the reservoir and the lands which make it available, and yet deny to The Swan Company the right to have the agreed consideration for this use of its land. No authorities are submitted which lead us to think that, under such circumstances, this contract should be held to be of no effect. The consequence of so holding would produce results so serious and far reaching that it is clear to us that no such action should be taken unless grounded upon crystal clear provisions of law and imperative necessity.

We have discovered no sections in the statutory law of this state relative to reservoir supply water which were operative at the time this contract was made which would render it void. Plaintiffs have not directed our attention to any such enactments. We have already mentioned that, at the time this lease was made, no restrictive laws were in existence relative to the use of storage water except the elemental principles of due appropriation of water and the application thereof to a beneficial use. It would seem that these requirements have been met in this matter, as we have seen. Even in the later laws of this jurisdiction, the legislature declared its policy as to reservoirs and storage rights, by providing that a description of the lands to be irrigated from storage water need not be inserted in the primary permit for the reservoir. In other words, such water may be applied upon such

lands as the parties who own the reservoir, and those who apply the water to a beneficial use, may agree upon. The latter are protected, by the provisions of Sec. 122-1501, W.R.S. 1931, supra. See also Sec. 122-1508, W.R.S. 1931, hereinbefore mentioned. Additionally, what has already been said relative to the substitution of irrigable acreage for non-irrigable acreage, in our discussion of the alleged fifth cause of action may appropriately be regarded as also pertinent as to the acreage involved in this lease contract.

Aside from all these considerations, this contract has been acquiesced in by all the parties concerned for decades. In reliance upon it all parties have expended large amounts of money, time and labor. If ever the principles of laches, estoppel or limitation of action, should be regarded as available as a defense, it would seem the alleged cause of action now being considered presented on its face such a situation.

### CONTROVERSIES ASSERTED THROUGH THE
### SEVENTH, EIGHTH AND NINTH CAUSES OF ACTION

The stated controversies alleged to have arisen upon the statement of facts set forth in these three causes of action are grounded upon plaintiffs' theory that it is necessary for the interested parties, through the District Court, to determine the so-called "dependable" supply of water from all sources. It is urged, too, that all acreage owned by the Development Company and the Industrial Company, all lands outside the area described in the decree entered December 27, 1912, or Permit No. 1724, and all lands described in said permit or decree, conveyance for water for which was executed after the exhaustion of this "dependable" supply, should be excluded from the benefits of this irrigation project; also it is claimed that Reservoir No. 1, and the right to store water therein, as adjudicated by said

decree, belongs to the owners of lands who hold deeds in the form of "Exhibit A" and that the Development Company has no interest therein; and further it is asserted that the Development Company and the Industrial Company, have no right to operate or manage the entire project, because they have no interest in it, but act merely as agents of individual landowners and must surrender the entire system to them and account to them relative to their management and operation thereof.

What has been heretofore said concerning a "dependable" water supply and the provisions of the contracts in the form of "Exhibit A," dispose of these alleged controversies. They are without merit. If claims of this character were upheld additional controversies without end would be produced.

As to the claim that, under the terms of the deeds or contracts aforesaid, the operating companies propose to collect from the landowners under the project "a pro rata share of the expense of defending this suit," no facts are alleged which would indicate that any such controversy had arisen. The companies aforesaid may never attempt or actually take any such action. There is nothing in the amended petition which would seem to indicate that they will. In Ladner v. Siegel, 294 Pa. 368, 144 At. 274, the Court, referring to the declaratory judgments statute in that state, said that:

"There is no power granted by this act to give advisory opinions in moot cases (33 C.J. 1100), or to determine matters not essential to the decision of the actual controversy before the court, though such questions may in the future require adjudication (Brown's Estate, supra), or pass upon contingent or uncertain situations (Tanner v. Boynton Lumber Co., 98 N.J. Eq. 85, 129 A. 617; In re Gooding's Will, 124 Misc. Rep. 400, 208 N.Y.S. 793), nor will the court

prejudge a case which possibly may arise, nor act unless all interested appear as parties, since the decree is a final adjudication."

See also Tanner v. Boynton Lumber Co., supra; and 16 Am. Juris. 292, Sec. 18, says that:

"As a general rule, the courts will not render a declaratory judgment as to future rights, but just as in ordinary actions will wait until the event giving rise to the rights has happened, or, in other words, until the rights have become fixed under an existing state of facts."

Mention may properly be made here of the principle relative to the construction of the Uniform Declaratory Judgments Act announced by the Supreme Court of Nebraska in Stewart v. Herten, 125 Nebr. 210, 249 N.W. 552. Listing an extended number of cases that Court said:

"It may now be fairly said to be a uniform rule of construction in these states that proceedings for a declaratory judgment will not be entertained where another equally serviceable remedy has been provided for the character of case in hand."

See also Caldwell v. Gim Packing Co. 52 Cal. App. 2d 80, 125 Pac. 2d 901.

We cannot see that the District Court abused its discretion in declining to pass upon this matter.

In our view of the entire case the District Court acted properly in sustaining the several demurrers of the defendants and in entering judgment as it did and that judgment should be affirmed.

*Affirmed.*

KIMBALL, C. J., and BLUME, J., concur.