Albert H. CRANSTON et al., Appellants
(Plaintiffs below),

Wyoming Political Action Committee for Ed-
ucation and Wyoming State AFL–
CIO (Intervenors Below),

v.

Thyra THOMSON, Secretary of State, et al.,
Appellees (Defendants below).

WYOMING POLITICAL ACTION COMMIT-
TEE FOR EDUCATION, Appellant
(Intervenor below),

Wyoming State AFL–CIO
Intervenor below),

and

Albert H. Cranston et al.,
(Plaintiffs below),

v.

Thyra THOMSON, Secretary of State et al.,
Appellees (Defendants below).

WYOMING STATE AFL–CIO, Appellant
(Intervenor below),

Wyoming Political Action Committee for
Education (Intervenor below),

and

Albert H. Cranston et al., (Plaintiffs below),

v.

Thyra THOMSON, Secretary of State, et al.,
Appellees (Defendants below).

Nos. 4445–4447.

Supreme Court of Wyoming.

Jan. 17, 1975.

Rehearing Denied March 31, 1975.

Walter C. Urbigkit, Jr., of Urbigkit, Moriarity, Halle & Mackey, Cheyenne, for appellants Cranston and Wyo. State AFL–CIO.

Charles E. Graves and Patrick E. Hacker, Cheyenne, for appellant Wyo. Political Action Committee for Ed.

Laurence Gold, Washington, D. C., for appellant Wyo. State AFL–CIO.

David B. Kennedy, Atty. Gen., Jerome F. Statkus, Asst. Atty. Gen., and William M. Sutton, Sp. Asst. Atty. Gen., Cheyenne, for appellees, Thyra Thomson and the Office of the Attorney General, State of Wyoming.

John Lynch, Deputy County and Prosecuting Attorney, Cheyenne, for appellees, Thomas J. Carroll and John B. Huisman.

Before PARKER*, C. J., McEWAN, GUTHRIE and McCLINTOCK, JJ., and ARMSTRONG, District Judge.

Mr. Chief Justice PARKER delivered the opinion of the court.

This is an appeal by plaintiffs and the two intervenor organizations from an order dismissing the complaints for failure to state a justiciable cause.[1] In their complaint plaintiffs sought to declare void and unconstitutional § 22.1–401, W.S.1957, 1973 Cum.Supp., requiring a candidate's written approval to expenditures on his behalf, and certain subsections of § 22.1–389, W.S. 1957, 1974 Interim Supp.,[2] concerning the limitation of campaign expenditures and restricting certain practices. There was also a prayer seeking to prohibit enforcement of the mentioned statutes, but this aspect is not pursued in the appeal.

The complaint asserted plaintiffs' status as resident electors, that said Cranston and Doughty had been candidates for state representative in the 1972 election and Cranston was an announced candidate for the same office in 1974, that Otto "may become a candidate for office in 1974," and alleged the membership of all plaintiffs in one or more organizations which seek through joint action to support the nomination and election of candidates for public office, which activities exposed the plaintiffs to potential civil and criminal penalties. It stated that the challenged statutes affected and harmed them, charging unconstitutionality on numerous grounds as violative of "Article I, Section 1, Article I, Section 2; Article I, Section 3; Article I, Section 6; Article I, Section 7; Article I, Section 9; Article I, Section 10; Article I, Section 11; Article I, Section 20; Article I, Section 21; Article I, Section 27; Article I, Section 34; Article I, Section 36; Article III, Section 27, of the Constitution of the State of Wyoming and the First, Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States. Article I, Section 4 and Article VI of the Constitution of the United States * * *."

---

\* At the time these causes were considered and the opinion drafted, Justice Glenn Parker was a member of the court and the chief justice. He has, however, since retired.

1. The order also dismissed the Secretary of State and the Laramie County Clerk as defendants.

2. Section 22.1–389 (c), (d), (e), (f)—and (g) as applied to (d), (e), and (f)—W.S.1957, 1974 Interim Supp.

The intervenor AFL-CIO stated its organizational structure, certain provisions in its constitution, and said that it had "in the past and anticipatorily in the future, will endorse candidates, make contributions from funds voluntarily contributed and otherwise support the electoral interests of candidates including specifically those seeking national office, deemed best to recognize and support the interests of labor." Its prayer was similar to that of plaintiffs.

The intervenor Wyoming PACE recited its voluntary nonprofit, unincorporated status, the individuals combined to support political candidates favorable to education, the receipt of donations from its members, and the selection through its board of directors of candidates favorable to education, who would receive the campaign donations. PACE charged unconstitutionality of the mentioned statutes on grounds substantially similar to those asserted by plaintiffs and by the intervenor AFL-CIO, appending a like prayer.

In an amended complaint the intervenor AFL-CIO recited additionally its contribution of moneys in various capacities to candidates in the 1972 general election as well as the fact that it had on hand substantial funds collected from per capita tax and moneys received from nonresidents of the State and desired to contribute some of the money to the Congressional candidate and presently planned and desired to continue its past practice of making contributions to candidates for election.

In an amended complaint, PACE further alleged that it presently held a checking account of $4,152.90 contributed by its members for the purposes of soliciting and receiving donations to the campaigns of announced political candidates supporting education or to the political parties they represent, and that its Board of Directors had selected certain candidates whom they wished to support and had donated the sum of $500 to the National Education Association Political Action Committee, an organization which makes campaign donations to candidates for the United States Congress and Senate from various states, including Wyoming.

From a dismissal of plaintiffs' and intervenors' complaints, on the grounds that neither the pleadings nor the testimony in evidence adduced in support thereof gave rise to a justiciable controversy upon which the court might act, this appeal has resulted.

The appellants here urge the existence of a justiciable controversy, the unconstitutionality of the challenged laws on the grounds asserted in the pleadings, and ask for a decision as to the merits of the action. The threshold question, of course, is that of justiciability, the basis for the trial court's order of dismissal. On that aspect, all parties here take comfort in the case of Brimmer v. Thomson, Wyo., 521 P.2d 574; and it may therefore be salutary to summarize our analysis of what was said therein.

Aside from general discussion explanatory of but unnecessary to the result, we held in Brimmer that each of the three senators who were defendants had, if qualified therefor, a genuine, existing, and fundamental right to seek the public office of governor. Such right had been improperly restricted and abrogated by a previous opinion of the Attorney General. Thus, a justiciable controversy existed. In reaching the decision, various incidental and foundation matters received some attention, including (a) the necessary elements of a justiciable controversy under the Uniform Declaratory Judgments Act, (b) a notation of the unquestioned axiom that the Declaratory Judgments Act cannot be relied upon to secure an advisory opinion, and (c) the caution essential to application of the public interest concept; but reference to any of these remarks taken out of context is unwarranted.

Perhaps there should be some delineation of the rule that a declaratory judgment cannot be relied upon to secure an advisory opinion.

" * * * Courts will not render advisory opinions on abstract questions of law about which there is only a disagree-

ment rather than an actual controversy between the parties. * * *" *Wagner v. Mahaffey*, 195 Kan. 586, 408 P.2d 602, 605.

"The Declaratory Judgments Act gives courts no power to determine future rights or controversies in anticipation of events that have not occurred * * *." *Glasgow v. Fox*, 214 Tenn. 656, 383 S. W.2d 9, 13.

We adopt these holdings. The reasons for this rule are obvious since binding legal determinations made in the abstract and decisions rendered without concrete factual background would be imprecise, subject to speculation, and would create rather than diminish future controversies. We have thus made it clear that the court is precluded by logic as well as precedent from issuing advisory opinions. We have also indicated in Brimmer the requisites of a justiciable controversy under the Uniform Declaratory Judgments Act: (a) that it requires parties who have existing and genuine, as distinguished from theoretical rights and interests, (b) the controversy must be one upon which a court may effectively operate rather than an argument calling for a purely political, administrative, philosophic, or academic conclusion, and (c) it must be one of which a judicial determination may have the force and effect of a final judgment upon the rights, status, or legal relationships of a real party in interest.

■■■ We think that, wanting any of these requisites, a great public interest alone is insufficient to warrant the action of the court under any situation which we might at present foresee. As has been pointed out in numerous authorities, the difference between an abstract question and a controversy contemplated by the Uniform Declaratory Judgments Act is necessarily one of degree; and it is diffi-

cult, if not impossible, to fashion in advance a precise test for determining the question. Basically, the problem in each case is whether the facts alleged under all the circumstances show that there is a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the declaratory judgment. *Golden v. Zwickler*, 394 U.S. 103, 89 S.Ct. 956, 959–960, 22 L.Ed.2d 113.

■■■ In the matter before us, there are asserted either by the pleadings or the evidence no existing right or interest with the possible exception (1) of an opinion of April 29, 1974, by the Attorney General to the Secretary of State wherein the questions[3] were answered in the affirmative, and (2) the pleaded and undenied payment by PACE of $500 to the National Education Association Political Action Committee. As to the Attorney General's opinion, the questions asked were not sufficiently concrete to dispose of any dispute here between the parties. As to the mentioned PACE $500 payment, there was no information presented showing it to have been received by the organization to which it was sent or what was done with it thereafter.

Next to Brimmer, appellants seem to place most reliance on *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201, and quote from 410 U.S. at 188, 93 S.Ct. at 745:

"Inasmuch as Doe and her class are recognized, the question whether the other appellants—physicians, nurses, clergymen, social workers, and corporations— present a justiciable controversy and have standing is perhaps a matter of no great consequence. We conclude, however, that the physician-appellants, who are Georgia-licensed doctors consulted by pregnant women, also present a justicia-

3. "QUESTION [1]: Is the Campaign Expenditure Limitation of the Wyoming Election Code Applicable to Federal Candidates?
"QUESTION [2]: Are the Provisions of the Wyoming Election Code which Place Limitations on Contributions and Ex-

penditures by Associations and Groups Applicable to Federal Candidates?
"QUESTION [3]: Will Reports filed by Federal Candidates in Accordance with Federal Statutes Satisfy State Campaign Reporting Requirements?"

ble controversy and do have standing despite the fact that the record does not disclose that any one of them has been prosecuted, or threatened with prosecution, for violation of the State's abortion statutes. The physician is the one against whom these criminal statutes directly operate in the event he procures an abortion that does not meet the statutory exceptions and conditions. The physician-appellants, therefore, assert a sufficiently direct threat of personal detriment. They should not be required to await and undergo a criminal prosecution as the sole means of seeking relief. * * *"

The quoted language is only a small portion of a rather involved opinion issued simultaneously with another case, Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed. 2d 147, dealing with related matters, inter alia, the issuance of a declaratory judgment concerning the constitutionality of abortion statutes. Justice Blackmun, the author of both opinions, stated in Roe that the two cases "of course, are to be read together," 410 U.S. at 165, 93 S.Ct. at 733. An analysis of these two cases discloses that in the instance where the woman plaintiff (or the married couple) is merely apprehensive of what may occur in the future plaintiff's position is held to be of a speculative character and an allegation concerning it does not present a justiciable controversy, while in a circumstance where there is an actual pregnancy the opposite is true. The situation of Jane Roe's physician, as to justiciability is unimportant to the present controversy since there the Supreme Court declined prosecution for abortion activities then pending before the Texas court and rejected his alternative contention that he was a "potential future defendant" since there was no showing that he would suffer great and immediate irreparable injury by virtue of being prosecuted in the state courts where he could make his constitutional contentions.

In Doe v. Bolton, supra, May Doe was held to have presented a justiciable controversy since at the time of the complaint she was actually pregnant, the alleged interference with her rights was clear, immediate, and present, rather than speculative and futuristic. The same rationale was applied to the doctors.

It follows, therefore, that the holdings in the mentioned decisions of the United States Supreme Court are consistent with the opinions of this court and in particular with that of Brimmer v. Thomson, supra, where we indicated that to present a justiciable controversy there must be the violation of a genuine, existing, and fundamental right, and that the court would not issue advisory opinions dealing with future speculative matters.

Neither the complaints in the present case nor the evidence adduced before the trial court dealt with more than speculations and possibilities. Actually the requests presented by the three complaints were for advisory opinions on multifaceted matters, answers to which could scarcely fail to proliferate rather than resolve controversy.

We do not reach the various constitutional questions which are posed.

Affirmed.

ARMSTRONG, District Judge (concurring).

I concur in the majority opinion, especially with respect to the lack of a justiciable controversy on the part of the intervenors. I agree that the threshold to the successful maintenance of a declaratory judgment action is the clear demonstration of such a controversy.

The dissent in this case, and the majority opinion in *Brimmer*, approximate advisory opinions, from which everyone seems to shy away.

Semantics aside, in a case of this kind where a sizeable public interest is involved and where the legislature has presently pending a bill to amend the Frisby amendment, it behooves me to state candidly that if a controversy had been shown I would have concurred with the dissent in declaring the offensive section of the amendment unconstitutional.

McCLINTOCK, Justice (dissenting).

I do not disagree with the majority in their view that an action for declaratory judgment must present a justiciable controversy and that the courts should not render advisory opinions.[1] My disagreement is with the application of those principles to the facts of this case and the expressed fear that a decision thereon would be "rendered without concrete factual background, * * * subject to speculation, and would create rather than diminish future controversies".

As shown by their complaint, the individual plaintiffs at the time of filing the action were actual or potential candidates for political office within the state or were members of organizations interested in supporting political candidates. Pleadings and evidence establish that Wyoming AFL–CIO is a voluntary union of unions within the state, which by its constitution has the declared purpose to participate in the political life of the local, state, and national communities, including fostering legislation which will safeguard and promote the principle of collective bargaining. The constitution of the Wyoming Political Action Committee for Education (PACE) declares one of its objectives to be "to solicit and receive donations which shall in turn be contributed to campaigns of announced political candidates chosen for their support of education or to the political parties they represent".

All pleadings further allege that application of the so-called Frisby amendment [2] to the activities of these individuals and organizations will constitute an improper and unconstitutional interference with the reasonable and practical exercise of their political rights. But under the view of the majority none of the plaintiffs may secure a determination of the invalidity of the statute because there is no justiciable controversy presented. A closing paragraph of the majority opinion sums up the objections to the action:

"Actually the requests presented by the three complaints were for advisory opinions on multifaceted matters, answers to which could scarcely fail to proliferate rather than resolve controversy."

Considering the first of three requisites of justiciability said to be recognized in Brimmer v. Thomson, Wyo., 521 P.2d 574, that there be parties who have existing and genuine, as distinguished from theoretical, rights and interests, I would first refer to the testimony of L. Keith Henning, chief executive officer of the state AFL–CIO, and Ed Brennan, state chairman of PACE.

Mr. Henning testified as to the operations of the organization since its inception in 1956. Each affiliated local union contributes to the state organization dues of 40 cents per month for each of its members, of which sum five cents is earmarked as a political fund, expended through a standing Committee on Political Education

1. Brimmer v. Thomson, Wyo., 521 P.2d 574; Anderson v. Wyoming Development Company, 60 Wyo. 417, 154 P.2d 318; Holly Sugar Corporation v. Fritzler, 42 Wyo. 446, 296 P. 206.

2. Subsection (e) of § 22.1–389, W.S.1957, 1974 Int.Supp., provides in pertinent part that no monetary contribution or expenditure may be made by certain described organizations including trade associations and labor unions, unless:

"(i) The contribution or expenditure is approved by at least sixty-six and two-thirds percent (66⅔%) of the members of the organization who reside within the area from which the candidate may be elected. Any blanket endorsement which could be construed to circumvent the intent of this subsection is prohibited. The individual

vote and endorsement by the membership is required for each candidate who is to receive a contribution; and

"(ii) The monies contributed or expended are from funds or contributions of only those members of the organization who reside within the district from which the candidate may be elected.

"Any device contrived to circumvent the intent and purpose of this subsection is prohibited."

Violation of these prohibitions is punishable by imposition of civil penalties up to $10,000, plus costs and reasonable attorney fee, § 22.1–389(g), W.S.1957, 1974 Int.Supp., as well as a fine up to $1,000 and imprisonment in the county jail for not more than six months, § 22.1–405, W.S.1957, 1973 Cum. Supp.

(COPE). In addition to these funds, tickets are sold for $2.00 each to voluntary contributors to COPE's activities. These funds are forwarded to the national AFL–CIO but one-half comes back for use by the state organization. At a state convention of delegates from the various local unions a determination is made to endorse certain candidates for federal, state, or local office, a two-thirds majority of the delegates being necessary for such endorsement. Information concerning such endorsements is disseminated among the membership and the general public. Contributions of financial help are made to some of these candidates, depending upon the importance to COPE of a particular race and the need of a candidate for support. Henning testified concerning the difficulties of making such endorsements and contributions in the face of the Frisby amendment:

> "The biggest problems that we have would be, number one, in getting the two-thirds vote of the entire membership before we can spend monies in individual cases. This becomes a function of the executive end of the organization and it changes day to day and we just could not function if we had to receive a two-thirds membership vote on this. Also, the very great problem is that we don't know where the money came from, what district it came from, and being able to decide that there were so many members in a certain county that we could expend funds on. There are also counties in the state that have officials up for election that we feel we have great interest in, yet we have very few members residing in that county."

Specific examples of this last problem were testified to by Henning.

During the 1972 campaign some $7,500, not representing funds contributed by its member locals but as to which COPE acted as agent, were distributed to federal candidates. $5,800, representing contributions through the five cent levy and sale of tickets was expended in support of endorsed candidates. $6,000 of such funds were on hand for expenditure in the 1974 campaign

(the testimony was given on June 21, 1974), but in the witness' own words the "passage of the Frisby Amendment has put us at a standstill" because until some determination is made of the act the AFL–CIO could not proceed. Contributions would be made in the 1974 election campaign if the matter was settled.

Mr. Brennan, after stating the constitutional purpose of PACE, testified that his group consisted of some 1,000 members scattered through the 23 counties of the state; that all contributions to the committee were voluntary; that money was received from members of the teaching profession and the general public through drives, raffles, and other functions; that it had participated in the 1970 and 1972 elections, legislative, congressional and county, and had given financial support to a number of those candidates. Endorsement of candidates was in some instances expressed through supportive letters mailed to voters in the county where the candidate was running. At the time of the hearing there was a fund of some $4,100 available for financial support of candidates and the board of directors had gone through the entire list of incumbent legislators and others who might be seeking office and had reached a decision to support some of the candidates. However, nothing could be done to effect this decision because the board was fearful of the criminal penalties that might result under the amendment.

The possibility of taking a "negative" vote, that is, one where the board would advise the membership of its decisions on various candidates and would consider them approved unless more than one-third of the membership should by letter disclose their rejection of such candidate, had been considered, but no decision reached. The board has been unable to come up with any feasible plan for taking votes of its 1,000 members that is economically feasible. In Brennan's words: "We would spend more money collecting votes than we do have to give to candidates", and the effect of this is that "we could not be effective as an organization".

I see nothing speculative or theoretical in this testimony. I view it as factual, a recitation of the manner in which these two organizations have operated up to the enactment of the amendment. I view as factual their testimony that they have funds on hand which they would like ·to spend in the support of candidates they consider favorable to their objectives but that they cannot do this because of the amendment.

The second requisite to the establishment of a justiciable controversy is said to be that the controversy must be one upon which the court may effectively operate as distinguished from an argument calling for an administrative, philosophic, or academic conclusion. I would consider this point more pertinent and of more importance were this an action only to obtain declarations as to the interpretation of the amendment, that is, if we were asked to tell the plaintiffs what they could or could not do and be in compliance with the statute. For example, PACE includes a prayer that the court answer certain questions as to whether designated conduct would constitute a violation of the statute. But this is an alternative prayer and all of the complaints specifically ask that subsection (e) be declared unconstitutional and void. To decide such a question, against the background of what I believe must be considered a factual situation, is not in my opinion an entry into any academic or philosophic discussion.

I hold the same views with respect to the third requisite cited by the majority, that the judicial determination must have the force and effect of a final judgment upon the rights, status, or legal relationships of a real party in interest. Again, upon my view that the plaintiffs have alleged and shown a definite and real interference with their method of operation, I do not see how it could possibly be said that a judgment declaring the statute unconstitutional would fail to be a final judgment upon the rights, status, or legal relationship of these plaintiffs, justifiably concerned with protecting their way of participating in political activity and therefore being real parties in interest. We had no difficulty in determining and declaring a criminal statute unconstitutional in Doe v. Burk, 513 P.2d 643. Although by a split decision, in State v. Stern, 526 P.2d 344, we declared our so-called breaking and entering statute unconstitutional. I would assume that these statutes may no longer be considered as effective in Wyoming. I would consider that a judgment that the Frisby amendment was unconstitutional would similarly have the practical effect of eliminating it from future concern to anyone. The Supreme Court of the United States in a host of cases, has held that the validity of a state statute may be properly challenged on constitutional grounds under the federal declaratory judgment law.[3] Under those decisions a declaration of unconstitutionality under the federal constitution is a final and effective judgment. I must disagree with the majority when they conclude that a declaration of unconstitutionality in this case would create or proliferate future controversies.

I am further of the opinion that to distinguish *Brimmer* on the basis that in that case there was an official opinion of the attorney general's office which was adverse to the right of the defendants therein to seek the nomination for governor of the state, while in this case there is no such opinion is a distinction without significance.[4] Section 1–1052, W.S.1957 provides in plain language that:

"Any person * * * whose rights, status or other legal relations are affect-

3. See Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed. 2d 201 (1973).

4. It would hardly be denied, I think, that the controversy in this case is much more realistic than that in *Brimmer* where all the contesting parties were in agreement as to answer to the question posed by the suit. A number of motions were submitted and disposed of by the district court after filing of extensive briefs and oral argument, with the

ed by a statute * * * may have determined any question of construction or validity arising under the * * * statute."

It does not provide that anyone whose rights under a statute as interpreted by the attorney general or other public official may have such declaration. While there might be reason for declining to exercise discretion to make declarations under such posited circumstances as to be ridiculous, there is nothing fanciful about the situation in which the plaintiffs find themselves, and the Frisby amendment, not the Attorney General's construction thereof, is what endangers the plaintiff's exercise of political rights in the only manner in which they consider such exercise effective.

The foregoing relates only to the justiciability of the action insofar as it seeks declarations as to the unconstitutionality of the Frisby amendment. However, all plaintiffs specifically raised the question that insofar as any legislation relating to the support of candidates for federal office is concerned, state laws are either inapplicable or invalid because federal legislation has preempted the field. This contention had been specifically rejected by an attorney general's opinion, No. 12, dated April 29, 1974. If *Brimmer* is valid only because the there asserted right of the midterm senators to run for the office of governor was clouded by the deputy attorney general's "qualified no" opinion, then it would seem in this case that the asserted right of AFL–CIO and PACE to endorse and support federal candidates of their choice is similarly clouded and there is a justiciable controversy in that respect. Counsel for AFL–CIO argue this question in their brief and the Attorney General responds thereto but does not again comment after plaintiffs' filed supplemental brief setting

forth the final federal act and history thereof.

I shall not argue the merits of the Attorney General's contention that only a candidate for federal office would have standing to raise the question except to state that the action seeks to determine and protect the right of citizens, whether as individuals or associations, to express themselves in elections, a right which I consider a first amendment right of the first magnitude. I do not believe only a candidate has the standing to claim a constitutional right is clouded by improper state legislation. I think that a justiciable controversy on a serious question was raised by the pleadings, the briefs, and supplemental brief. I think that the majority improperly ignore that question.

I should add that I am convinced that subsection (e) of the Frisby amendment is unconstitutional and that the decision of this Court should be to that effect, notwithstanding that the district court did not reach a conclusion on that point. It is my opinion that the case of the plaintiffs was completely developed in the district court, the Attorney General presented all the evidence that he considered pertinent on the issues, and I find no questions of fact that should be left to the prior determination of the original trier of the fact. In the last analysis it is only this Court which can effectively decide the questions of validity under our state constitution, and we have an equal obligation, subject to the final review of the Supreme Court of the United States, to enforce the constitution of the United States. While the original necessity for haste has been eliminated by the normal delays in getting a case to trial and then to this Court, I see nothing to be gained by further consideration in the trial court. I believe that a decision of this Court should and would end the controversy.

plaintiffs vigorously attacking the statute and the attorney general defending it with equal fervor. In *Brimmer*, only the deputy attorney general was heard to defend the "qualified no", given in the opinion of March 13, 1974, to the query of whether a state senator

could become a candidate for state office in the middle of his term. Actually, a withdrawal of the opinion by the attorney general himself would have eliminated the controversy entirely.

Counsel for AFL–CIO and PACE argue effectively and with citations of numerous authorities that subsection (e) is invalid under a number of state and federal constitutional provisions. Noting in passing that there is a very real vagueness of expression in certain portions of the subsection,[5] I do not think that this Court needs to reach or discuss all of the constitutional arguments raised, and I would hold the subsection unconstitutional because of its clear and unequivocal prohibiting of certain conduct by organizations other than political parties, except under conditions which the evidence shows could not be met in any practicable way so that in my opinion the statute amounts to a denial of the right of association and to operate as an association in the exercise of rights guaranteed under the first and fourteenth amendments to the United States Constitution and §§ 2, 3, 6, and 7 of Art. 1 of the Wyoming Constitution. While I find no cases directly in point, either of this Court or the Supreme Court of the United States, I do think that decisions of that court establish the principles that should govern our determination.

In Healy v. James, 408 U.S. 169, 181, 92 S.Ct. 2338, 2346, 33 L.Ed.2d 266 (1972), it is said that: "Among the rights protected by the First Amendment is the right of individuals to associate to further their personal beliefs." In the same vein are Bates v. Little Rock, 361 U.S. 516, 523, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960), Sweezy v. New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957), and National Association for the Advancement of Colored People v. Alabama, 357 U.S. 449, 460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958). In this last case it is said that:

"Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly. * * * Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny."

As was said in *Sweezy*, 354 U.S. at 250, 77 S.Ct. at 1212, "Our form of government is built on the premise that every citizen shall have the right to engage in political expression and association." The individual plaintiffs in this action are persons who seek to associate and obtain the support of associations in political activity; AFL–CIO and PACE are organizations which seek to express and have their views known in political campaigns, and one of their methods of doing so is by the endorsement and support of candidates. Their activities are materially curtailed if not eliminated by the two-thirds vote requirement, and they are definitely discriminated against in their manner of contributions in that individuals, from within or outside the state, may make contributions in any election district they choose, while these associations may only contribute to the extent of the contributions by their *members* in the particular election district. They may not even seek the contributions of nonmembers for use in those areas. I confess myself unable to see how either subsections (e)(i) or (e)(ii) can be said to further any important interest of the state of Wyoming. I fail to see how a contribution by one person of $1,000 can be good and an equal contribution representing the combined donations of 1,000 persons can be evil. There is then a very real denial of

---

5. I am at a loss to understand just what is meant by the expression that "[a]ny blanket endorsement which could be construed to circumvent the intention of this subsection" ((e)(i)) and that "[a]ny device contrived to circumvent the intent and purpose of

this subsection" ((e)(ii)) are prohibited. However, I do not consider that they are so important to the section that the legislature would not have enacted it with the deletion of these two sentences.

equal rights to those people who would combine their efforts to be politically effective.

Because of my conviction that the Frisby amendment is unconstitutional and my further question concerning its applicability to elections of federal candidates, I think it most unfortunate that a majority of this Court has seen fit to reject jurisdiction of the action, apparently brought in all good faith, and raising questions that are to me of substantial importance. I have cause to wonder how a solution of those problems will be reached. The Attorney General states that he does not want interested and conscientious citizens to flout the law, thereby risking civil penalties of considerable size, and even fine and imprisonment, but I find little help for these people in his suggestion that "[i]maginative legal procedure could be employed to establish a valid factual situation which would define the issues yet fall short of incurring any penalty". The brief does not suggest such procedures [6] and my imagination is not equal to the task he seeks to impose. The majority decision leaves this matter in the most regrettable situation that plaintiffs' important political rights are clouded by the action or inaction of the Attorney General. The only alternative to risk of criminal liability seems to me to be an action in the federal courts under federal legislation relating to civil rights or declaratory judgments relief. I would have preferred action by this Court.

Mr. Justice McEWAN, concurring in the dissent of Mr. Justice McCLINTOCK.

The majority seek to distinguish *Brimmer* from this case on the basis that in

*Brimmer* there was an attorney general's opinion that the incumbent senators could not be candidates for governor, while in this case there was no opinion. The majority fail to recognize that in *Brimmer* the opinion was issued by the deputy attorney general and the attorney general himself instituted the action and asked that the incumbent senators be declared eligible to become candidates. The bringing of such an action by the attorney general must necessarily be construed as a tacit withdrawal of the opinion and tantamount to no opinion being issued. In any event, I cannot believe that a letter from a "friendly" attorney general or a cooperative county attorney could make the difference between a matter being or not being a justiciable controversy.

## ORDER

GUTHRIE, Chief Justice.

Petition for rehearing having been filed by appellants, and the court having fully considered the same, but inasmuch as in the meantime Enrolled Act No. 131 relating to election procedures has been enacted by the Forty-Third Legislature and this amendment changes materially the provisions of §§ 22.1–389 and 22.1–401, W.S.1957, 1973 Cum.Supp., involved in the action; and it further appearing that further consideration of the Act as involved in the action herein would have no effect upon existing rights, and that because of the amendment the action may be considered moot,

It is therefore ordered that the petition for rehearing be and the same is hereby denied.

6. Although upon the oral argument of the case I particularly asked the Attorney General

for examples of such possible procedures, I confess that I remain unenlightened.